

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,406

### RONNIE JOE NEAL, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 2005-CR-0698 IN THE 226TH DISTRICT COURT
### BEXAR COUNTY

**KELLER, P.J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY and HOLCOMB, JJ., joined. MEYERS, J., filed a concurring opinion. PRICE, and JOHNSON, JJ., concurred. COCHRAN, J., concurred in points of error 18, 24, and 25 and otherwise joined the opinion of the Court.**

### O P I N I O N

A jury convicted appellant of capital murder.[1] Pursuant to the jury's answers to the special

issues set forth in Texas Code of Criminal Procedure, Article 37.071, §§ 2(b) and 2(e), the trial judge

---

[1]TEX. PEN. CODE § 19.03(a)(2)("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, [or] aggravated sexual assault . . . .").

sentenced him to death.[2]  Direct appeal to this Court is automatic.[3]  Appellant raises twenty-six

points of error.  We find all of them to be without merit and therefore affirm.

### I. DETERMINATION OF MENTAL RETARDATION

Appellant's first three points of error concern the absence of legislation implementing

procedures consistent with the United States Supreme Court's holding in *Atkins v. Virginia*.[4]  In

point of error one, appellant argues that Texas's death penalty scheme violates the Eighth and

Fourteenth Amendments to the United States Constitution given the absence of such legislation.

The Supreme Court held in *Atkins* that the execution of a mentally retarded person violates

the Eighth Amendment's prohibition on "cruel and unusual punishment."[5]  Recognizing that there

is "serious disagreement" in "determining which offenders are in fact retarded," the Court "[left] to

the States the task of developing appropriate ways to enforce the constitutional restriction upon its

execution of sentences."[6]  In response to *Atkins*, this Court created temporary judicial guidelines for

trial courts in the absence of legislation.[7]  We set forth a substantive test (detailed below under points

of error eight and nine) and procedural guidelines for trial courts to follow in determining whether

a defendant is mentally retarded for the purposes of an *Atkins* claim.[8]  Over four years later, the

---

[2] Art. 37.071, § 2(g).  All Articles cited in this opinion refer to the Texas Code of Criminal Procedure unless otherwise stated.

[3] Art. 37.071, § 2(h).

[4] 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

[5] *Id.* at 321.

[6] *Id.* at 317.

[7] *Ex parte Briseño*, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004).

[8] *Id.* at 5-13.

Texas legislature still has not enacted any legislation on this matter.

Appellant argues that the use of judicial rather than statutory guidelines contravenes the mandate of *Atkins*. The Supreme Court repeatedly stated, however, that it was "leav[ing] up to the States" how to ensure that the death penalty not be imposed on mentally retarded defendants.[9] The opinion never specified that this task must be performed exclusively by state legislatures rather than any other state government entity. *Atkins* specified the end result to be achieved; it did not delineate the mechanisms through which to achieve them, except that they are to occur at the state level. If the Court had intended to direct only legislatures to act, then it could have easily referred to "the state legislatures." Appellant's contention that the Supreme Court's references to "the States" actually meant "the state legislatures" is untenable.

Appellant argues that the Supreme Court itself, in *Schriro v. Smith*, reversed a Ninth Circuit opinion instructing a trial court on how to comply with *Atkins*.[10] This argument misreads that case. The Supreme Court did not say that the Ninth Circuit was a judicial body usurping a function properly reserved to the legislature. Rather, the Court explained—in a short, *per curiam* opinion—that the Ninth Circuit was a federal body usurping a function that the *Atkins* opinion had plainly vested in "the States."[11] *Schriro* simply did not present any issue of whether a particular ruling by a state court might be subject to constitutional challenge.[12]

Appellant maintains that the continued application of our guidelines violates the separation

---

[9] 536 U.S. at 317.

[10] 546 U.S. 6, 126 S. Ct. 7, 163 L. Ed. 2d 6 (2005).

[11] *Id.* at 7.

[12] *Id.*

of powers clause of the Texas Constitution,[13] relying largely on our statement in *Briseño* that "[t]his Court does not, under normal circumstances, create law."[14]  Yet we included that dictum precisely because we faced not a "normal" situation but an extraordinary one.[15]  The holding in *Atkins* had compelled us, in the absence of any applicable legislation, to ensure that the procedures used in Texas conform to the Supreme Court's interpretation of the Eighth Amendment.[16]  Appellant does not take issue with that decision, but maintains that the procedures are no longer valid because we stated in *Briseño* that they would be merely "temporary judicial guidelines" during a "legislative interregnum."[17]  However, in the four years since we decided *Briseño*, nothing new has happened to invalidate those guidelines.  We remain in the same situation we were in the day we decided *Briseño*: the legislature has not acted.  The rationale set forth in that opinion thus continues to apply to capital cases in which mental retardation is at issue.

Unless legislative action is taken, the current guidelines remain in effect because there is no adequate alternative that would ensure that our judicial system complies with the Supreme Court's mandate.  Appellant asks us to delay the administration of justice until some indeterminate point in the future, but we must remember that, as we observed in *Briseño*, "justice delayed is justice denied."[18]  Indeed, if we were to satisfy appellant's request, we would not know if that point would

---

[13] TEX. CONST. art. II, § 1.

[14] 135 S.W.3d at 4.

[15] *See id.*

[16] *See id.*

[17] *Id.*

[18] *Id.*

ever arrive, as it is impossible to know whether the legislature will ever take action. Appellant never clarifies what he would like to happen if no legislation is ever enacted, but the logical extension of his argument is that capital cases in which mental retardation is at issue would be relegated to a legal no-man's land, unable to reach a final resolution. To avoid such a denial of justice, we uphold the *Briseño* framework unless and until relevant legislation is enacted. Point of error one is overruled.

In point of error two, appellant argues that the lack of statutory procedures for adjudicating *Atkins* claims violates equal protection by subjecting different defendants to different trial procedures. We have repeatedly held to the contrary.[19] Appellant draws an analogy to the county-to-county discrepancies among election procedures at issue in *Bush v. Gore*,[20] but we have rejected precisely this analogy in previous cases.[21] Point of error two is overruled.

In point of error three, appellant contends that the trial court erred in failing to abate the proceedings until the legislature enacts statutory guidelines for determining mental retardation. This point of error presupposes that the lack of such legislation violates appellant's constitutional rights. As we have already rejected appellant's claims to that effect, we reject this one as well. Point of error three is overruled.

In point of error six, appellant contends that the trial court erred in declining to empanel a separate jury to determine whether appellant is mentally retarded. Appellant argues that the jury had not been qualified at *voir dire* to determine the issue of mental retardation, but he forfeited this claim

---

[19] *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Threadgill v. State*, 146 S.W.3d 654, 672 (Tex. Crim. App. 2004); *see also Gallo v. State*, 239 S.W.3d 757, 779-80 (Tex. Crim. App. 2007); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

[20] 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000).

[21] *Roberts*, 220 S.W.3d at 534; *Threadgill*, 146 S.W.3d at 671-72.

by failing to question the jurors on mental retardation at *voir dire*. Appellant further argues that the jury's determination was tainted because it had already found appellant guilty and was thus predisposed to find that he was not mentally retarded. We have found no authority for the proposition that mental retardation may not be determined by a jury that has already determined guilt, and appellant cites none. Indeed, we have noted that the nature of the offense itself may be relevant to a determination of mental retardation;[22] thus, a jury already familiar with the evidence presented at the guilt stage might be especially well prepared to determine mental retardation. We see no basis on which to impose on trial courts a requirement to empanel a separate jury to determine whether a defendant is mentally retarded. Point of error six is overruled.

In points of error eight and nine, appellant contends that the jury's determination that appellant is not mentally retarded is against the great weight and preponderance of the evidence. For the purposes of an *Atkins* claim, we have defined mental retardation as "1) significant sub-average general intellectual functioning, usually evidenced by an IQ score below 70, that is accompanied by, 2) related limitations in adaptive functioning, 3) the onset of which occurs prior to the age of 18."[23] Factors relevant to evaluating the three prongs include:

> Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

> Has the person formulated plans and carried them through or is his conduct

---

[22] *Briseño*, 135 S.W.3d at 8-9.

[23] *Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)(citing *Briseño*, 135 S.W.3d at 7).

impulsive?

Does his conduct show leadership or does it show that he is led around by others?

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?[24]

When an affirmative defense of mental retardation is asserted at trial, the defendant bears the burden to prove by a preponderance of the evidence that he is mentally retarded.[25]  In reviewing the sufficiency of the evidence to support a finding on mental retardation, we examine whether the finding is "so against the great weight and preponderance of the evidence so as to be manifestly unjust."[26]  We give "great deference" to the findings below, as the fact finder is in the best position to assess witnesses' credibility and resolve any conflicts in the evidence.[27]

We turn now to the evidence pertaining to mental retardation.  The defense presented two

---

[24] *Gallo*, 239 S.W.3d at 769-70 (quoting *Briseno*, 135 S.W.3d at 8-9).

[25] *Gallo*, 239 S.W.3d at 770.

[26] *Id.* (quoting *Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)).

[27] *Hall v. State*, 160 S.W.3d 24, 40 (Tex. Crim. App. 2006).

experts, but we will review only the testimony of Dr. Richard Garnett because he was the only one who testified specifically about appellant. Dr. Garnett testified that appellant had taken three IQ tests before age 18. Neither the defense nor the State administered an IQ test in preparation for trial. At age 11, appellant received an IQ score of 70. He received a score of 72 at age 15, and a score of 87 at age 17.

Dr. Garnett testified that the scores are lower if one applies the "Flynn effect." We have previously refrained from applying the Flynn effect, however, noting that it is an "unexamined scientific concept" that does not provide a reliable basis for concluding that an appellant has significant sub-average general intellectual functioning.[28]

Dr. Garnett further noted appellant's problems in school, including learning difficulties and failing the sixth grade. He also adjusted poorly to parole and was recommended for special placement by juvenile probation officers at the Texas Youth Council. In addition, Dr. Garnett cited various records and his own discussions with appellant's family and friends showing behavioral problems, difficulty following rules, poor organizational and decision-making skills, a history of getting into physical fights, and susceptibility to being manipulated or taken advantage of by others. Dr. Garnett further noted that these problems initially occurred before age 18. He concluded that appellant satisfied all prongs for mental retardation.

The State called four expert witnesses, all of whom concluded that appellant was not mentally retarded. Dr. James Sherman based this finding on records from school, juvenile detention, and other sources, as well as his own independent clinical evaluation. Based on his own testing of appellant, he concluded that appellant tended to underperform on examinations, possibly due to

---

[28] *Blue*, 230 S.W.3d at 166.

anxiety, depression, or simple lack of motivation. He testified that appellant understood the consequences of his actions and had a history of gang involvement and substance abuse, including alcohol, spray paint, marijuana, LSD, and cocaine. He further testified that appellant had a limited fund of general knowledge but was oriented as to place and time.

Dr. John Sparks received records from the State and also conducted an independent examination to report on sanity, competence, and mental retardation. He found that appellant was sane, competent, and not mentally retarded. Dr. Sparks testified that appellant had low intelligence but was able to cooperate with people and give reasonable responses to questions. Like Dr. Sherman, Dr. Sparks testified that appellant had a limited fund of general knowledge but was oriented as to place and time. Appellant had one head injury but no "organic brain syndromes." Based on appellant's problems with anger and depression, Dr. Sparks would diagnose appellant as having a "conduct disorder and antisocial personality."

Dr. Cesar Garcia had been appellant's doctor and testified based on his observations while treating appellant. He testified that appellant is articulate and could write out an adequate grievance statement. Appellant is organized, can navigate systems, and has "executive functioning skills." Finally, Dr. Garcia noted that appellant had devised an elaborate criminal escape plan. Based on these observations, Dr. Garcia testified that appellant is not mentally retarded.

Dr. Richard Coons examined various records related to appellant. He testified, in essence, that appellant's major problems are personal rather than intellectual. Dr. Coons testified that appellant is adaptive to society, fits in with the standards of his cultural group, is a capable worker, and is able to accomplish tasks when he is motivated to do so. Dr. Coons had reviewed creative writings by appellant and testified that he is "a prolific writer" and is competent at expressing his

thoughts. As an example, Dr. Coons read a poem by appellant in which he depicted himself as a lion struggling to break free from the cage in which society had trapped him.

Dr. Coons echoed Dr. Sherman in stating that appellant's poor performance on IQ tests seemed to result from extraneous problems such as anxiety, depression, or lack of motivation. Dr. Coons also noted that the aforementioned Flynn effect is properly applied only to groups and not to individuals.

Appellant's mother testified that appellant had behavioral problems, school problems, a possible head injury, and signs of depression. She referred to appellant's general "failure to thrive." She also testified that appellant had stolen things and dropped out of school.

The State presented two inmates, who simply testified that appellant had boasted about fabricating his own mental retardation defense.

Appellant has failed to establish the onset before age 18 of either significant sub-average general intellectual functioning or limitations in adaptive functioning. While there is much evidence that he had struggled in coping with society throughout his life, his underlying problems seem primarily behavior- and personality-related rather than related to low intellectual capacity. We will not second-guess the fact-finder's assessment of the relative weight and credibility of the testimony presented by the expert witnesses, four out of five of whom concluded, based on extensive research and examinations, that appellant is not mentally retarded. Finally, his acts in abducting and killing Ms. Tilly, as well as running a prostitution ring that included his own daughter, show that he was capable of planning elaborate criminal ventures and attempting, albeit unsuccessfully, to conceal the evidence. In light of the above facts, the evidence was sufficient to support the finding that appellant had not met his burden to prove mental retardation. Points of error eight and nine are

overruled.

## II. SUFFICIENCY OF THE EVIDENCE

In point of error twelve, appellant contends that the evidence supporting his conviction is factually insufficient due to insufficient evidence that he participated in the killing. In point of error eleven, he argues that there is insufficient evidence corroborating Pearl Cruz's accomplice testimony.

In addressing a factual sufficiency claim, we review the evidence in a neutral light rather than the light most favorable to the verdict.[29] Evidence is factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.[30] We do not reverse for factual insufficiency if the greater weight and preponderance of the evidence actually favors conviction.[31]

A conviction cannot be had upon the uncorroborated testimony of an accomplice witness.[32] Corroboration is not sufficient if it shows merely that the offense was committed.[33]

We now turn to a review of the evidence based on the above principles. Appellant's cellmate, Albert Mendiola, testified that appellant introduced himself by mentioning television coverage of his case. Appellant then confessed to Mr. Mendiola: "I killed her." Appellant told Mr.

---

[29] *Roberts v. State*, 220 S.W.3d at 524 (citing *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)).

[30] *Id.* (citing *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)).

[31] *Id.* (citing *Watson*, 204 S.W.3d at 417).

[32] Art. 38.14.

[33] *Id.*

Mendiola that he entered the home of Diane Tilly, a local schoolteacher, and took a Rolex watch, diamond ring, and gun from the home. He confessed that he raped her, using a condom "so there wouldn't be no evidence." Finally, appellant provided Mr. Mendiola with a detailed account of directing Ms. Tilly to walk into a "ranch road area." Once they had arrived at this area, Ms. Tilly told him that he still had time to change his mind, but appellant responded that he was not going to change his mind because she could turn him in if he released her. He then forced her to kneel down and shot her four times. As he was reloading his gun, she said, "It burns, it burns," after which he shot her one last time. Appellant told Mr. Mendiola that he was worried that Ms. Tilly's body might be found, so he "covered her up with logs and brush."

Throughout the events leading up to and following the rape and murder of Ms. Tilly, appellant was accompanied by his 15-year-old daughter, Pearl Cruz, who provided detailed, lengthy testimony at trial about these events. According to her testimony, she carried out her and her father's plan by knocking on Ms. Tilly's door and falsely saying that she needed to use Ms. Tilly's phone because her car had broken down. After Ms. Tilly let Cruz into her home, Cruz drew a gun, pointed it at Ms. Tilly, and ordered her to "get down on the floor," "face down." Ms. Tilly complied, and Cruz let appellant, who had been secretly waiting outside, into the house.

Appellant used shoelaces to tie Ms. Tilly's hands behind her back. Appellant and Cruz then found a gun and ATM card in the house. Appellant ordered Ms. Tilly to tell him her PIN so that he could use the ATM card, and Ms. Tilly gave a number. Appellant then briefly left the house while Cruz was still keeping Ms. Tilly there at gunpoint. Appellant returned and said that Ms. Tilly had given the wrong number. Again, he ordered her to tell him her PIN, and she gave a different number. Appellant left the house a second time, and later returned with cash.

Appellant then placed a sheet over Ms. Tilly's head and raped her. Cruz asked her father why he was not using a condom; he told her that he had used one but that it had slipped off. Afterward, appellant used peroxide on Ms. Tilly in an attempt to erase the evidence of his semen.

Cruz testified that she then watched appellant pack various items from Ms. Tilly's house, including a gold diamond ring and a Rolex watch, into her luggage. He put the items in Ms. Tilly's car, and he put Ms. Tilly herself in the back seat, her head still covered. Appellant drove the three of them in the car for about fifteen minutes, after which they got out of the car and walked into a wooded area.

Cruz went on to describe jumping over a barbed-wire fence with her father and then helping him lift Ms. Tilly over the fence. Ms. Tilly asked what they were doing, but appellant told her to keep quiet. Immediately thereafter, Appellant shot Ms. Tilly six times. As she was being shot to death, Ms. Tilly cried out, "Oh, my God, it hurts, it burns. Bless this child." Appellant and Cruz then crossed back over the fence, got into Ms. Tilly's car, and drove back to their motel room.

Later, while watching a missing person report on the television news about Ms. Tilly, appellant became worried that they would be discovered. He and Cruz returned Ms. Tilly's car to the same field in which they had killed her. Appellant poured gasoline over the car and set it on fire in a failed attempt to destroy any evidence in the car.

Cruz testified that after she was arrested, she led the police to Ms. Tilly's body which she and her father had covered up. She also described hiding the stolen credit cards in her underwear and flushing them down the toilet while she was in police custody.

Cruz's trial testimony conflicted with her earlier statement to the police, in which she did not state that her father had raped Ms. Tilly or that she had asked if she could shoot Ms. Tilly. When

asked why she had omitted these points from her earlier statement, Cruz said that she "was ashamed" when she first talked to the police. She further explained that she testified truthfully at trial to satisfy a plea agreement with the State in exchange for a thirty-year cap on her punishment.

An autopsy of Ms. Tilly revealed gunshot wounds in her right arm, back, and chest. The bullets leaving these wounds had passed through her right lung and aorta, as well as bone and muscle. Dr. Dimaio, who conducted the autopsy, concluded that Ms. Tilly probably died within "a few minutes" after being shot. Dr. DiMaio also testified that when Ms. Tilly's body was found, her hands were tied behind her back with shoelaces, and her legs were bent at the knees.

Robert Sailors, a forensic scientist working in the Bexar County Criminal Investigation Laboratory, testified about the results of a sexual assault evidence collection kit, in which he obtained a vaginal swab from Ms. Tilly's body containing a microscopic amount of spermatozoa. By comparing the swab with a DNA sample collected from appellant, Dr. Sailors found that appellant could not be excluded as the donor of DNA on the swab. Appellant's profile would be seen in only one in 138 trillion African-Americans.

Officer Melvin Lleras testified that he had examined a fingerprint on a liquor bottle found in Ms. Tilly's house and concluded that the print belonged to appellant.

Appellant argues that appellant's confession to Mr. Mendiola was inadmissible. We reject this argument, as we consider even inadmissible evidence when reviewing sufficiency of the evidence.[34]

By his own stark admission and that of his accomplice, appellant raped and murdered the

---

[34] *Johnson v. State*, 967 S.W.2d 410, 411 (Tex. Crim. App. 1998)(citing *Gardner v. State*, 699 S.W.2d 831, 835 (Tex.Crim.App. 1985)).

victim. Cruz recounted all the relevant events in great detail at trial, from the conception of their plan through its execution, as well as the aftermath in which she confessed to the police and led them to Ms. Tilly's body. Appellant himself gave his cellmate a more general account of how he committed the rape and murder. Taken together, the testimony of various witnesses—appellant, Cruz, and police officers involved in the case—present a clear picture in which appellant abducted Ms. Tilly, stole some of her valuable belongings, raped her, and fatally shot her several times in cold blood. This testimony was additionally strengthened by the fingerprint and DNA evidence. While there are some discrepancies among the various accounts of the events of that day, they are dwarfed by the cohesive overall picture. The evidence was factually sufficient to support appellant's conviction for capital murder. Moreover, Cruz's accomplice testimony was amply corroborated by the other evidence of appellant's guilt. Points of error eleven and twelve are overruled.

### III. JURY INSTRUCTIONS

In points of error four and five, appellant contends that the trial court erred in failing to place the burden on the State to prove beyond a reasonable doubt that appellant is not mentally retarded. We have held that the defendant bears the burden of proof to establish by a preponderance of the evidence that he is mentally retarded.[35] Points of error four and five are overruled.

In point of error seven, appellant contends that the trial court erred in failing to properly instruct the jury as to the consideration of mental deficiencies other than mental retardation as mitigating evidence. Appellant argues that the instruction given in this case is "somewhat similar" to the one we held unconstitutional in *Penry v. State*.[36] In that case, the trial court instructed the jury

---

[35] *Gallo*, 239 S.W.3d at 770.

[36] 178 S.W.3d 782 (Tex. Crim. App. 2005).

first to consider whether the appellant was mentally retarded and then to "consider whether any other mitigating circumstance or circumstances exist."[37] This Court held that the instruction might have confused the jury about whether it was allowed to consider evidence of mental deficiencies other than mental retardation.[38] The instruction in this case, however, specifically instructed the jury to consider "the mental impairment of the defendant that might not amount to mental retardation, if any."

Appellant further argues that the trial court's failure to mention a burden of proof in the instruction might have confused the jurors because they might have assumed that the burden of proof applicable to mental retardation also applies to other mental deficiencies. The defendant has the burden to prove by a preponderance of the evidence that he is mentally retarded, but neither side bears the burden of proof with respect to mitigation.[39] Although appellant claims that the trial court was required to instruct the jury on the latter point, he concedes that an instruction that neither side bears the burden of proof is generally not required.[40] Point of error seven is overruled.

In point of error thirteen, appellant contends that the parties charge would have allowed the jury to convict him of capital murder even if the jury had found that Cruz acted alone, without any involvement by appellant.

The jury instruction at issue stated:

---

[37] *Id.* at 783.

[38] *Id.* at 787.

[39] *Prystash v. State*, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999)("[B]ecause there are no constitutional limits on the jury's discretion to consider mitigating evidence, the constitution does not require a burden of proof.").

[40] *Jackson v. State*, 992 S.W.2d 469, 480-81 (Tex. Crim. App. 1999).

> To warrant a conviction of the defendant, Ronnie Joe Neal, of capital murder, you must find from the evidence beyond a reasonable doubt not only that *Ronnie Joe Neal and/or Pearl Cruz*, on the occasion in question, was or were engaged in the commission of the felony offenses of burglary, attempted burglary, kidnapping, attempted kidnapping, robbery, attempted robbery, aggravated sexual assault, or attempted aggravated sexual assault of the complainant, as defined in these instructions, but also that during the commission of any one of the offenses enumerated above, if any, the complainant was shot with a firearm with the intent of killing the complainant.[41]

A conviction should be reversed for unobjected-to jury charge error only if it resulted in "egregious harm."[42] Appellant concedes that no objection was made at trial, so the egregious harm standard applies. Harm is egregious if it deprives the appellant of a "fair and impartial trial."[43]

Even assuming arguendo that the jury instruction was erroneous in that it would have allowed the jury to convict appellant even if the jurors believed that only Cruz engaged in the acts described in the instruction, any such error would not have risen to the level of egregious harm. As explained in the factual sufficiency analysis above, the evidence of appellant's guilt was overwhelming. Appellant does not even argue that a reasonable juror might have found that Cruz acted alone, and there is nothing in the evidence to suggest as much. Point of error thirteen is overruled.

In point of error twenty-six, appellant contends that the jury instructions given pursuant to Article 37.071, §§ 2(d)(2) and 2(f)(1) were unconstitutional because they failed to inform the jury that if it were hung eleven to one, appellant would be sentenced to life imprisonment. Appellant

---

[41] Emphasis added.

[42] Art. 36.19; *Alamanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

[43] *Alamanza*, 686 S.W.2d at 171.

concedes that we have previously rejected challenges to these sections[44] and does not attempt to distinguish this case. We decline to overrule our precedents in this area. Point of error twenty-six is overruled.

## IV. EVIDENTIARY ISSUES

In point of error ten, appellant contends that the trial court erred in allowing Dr. Coons to testify as an expert witness. Appellant filed a motion requesting *voir dire* of expert witnesses. The trial court granted the motion and allowed Dr. Coons to testify after conducting a hearing on his qualifications. Appellant did not object to the admission of Dr. Coons's testimony based on inadequate qualification.

To preserve a complaint for appellate review, a specific and timely objection, motion, or request must be made to the trial court.[45] The complaint is timely only if the party makes the complaint "as soon as the grounds for it become apparent."[46] To be adequately specific, the complaint must "let the trial judge know what he wants and why he is entitled to it."[47] In this case, although appellant did request a hearing on expert qualification in the first place, he did not object once the trial court had qualified Dr. Coons. Thus, he forfeited the right to challenge that ruling on appeal. Point of error ten is overruled.

In point of error fourteen, appellant contends that the testimony of Albert Mendiola violated

---

[44] *See, e.g.*, *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995).

[45] T EX. R. APP. P. 33.1(a).

[46] *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)(citing *Hollins v. State*, 605 S.W.2d 475, 476 (Tex. Crim. App. 1991)).

[47] *Id.* (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

appellant's Sixth Amendment rights. As described in the factual sufficiency analysis above, appellant introduced himself to Mr. Mendiola while the two were in the same holding cell by initiating a conversation about killing Ms. Tilly. Later, Mr. Mendiola informed the government of the conversation but insisted that he wanted no favors in return. According to Mr. Mendiola's testimony, he did this purely to clear his own conscience.

The government's acceptance of an informant's offer of information after the informant receives the information does not convert the informant into a state agent.[48] Because he merely informed the government of appellant's confession after it was made, Mr. Mendiola was not a state agent. Moreover, even if Mr. Mendiola had been a state agent, no Sixth Amendment violation would have occurred because Mr. Mendiola did not elicit any statements from appellant, but merely listened to appellant's spontaneous confession.[49] Point of error fourteen is overruled.

In points of error fifteen and sixteen, appellant claims that the State violated his right to due process under the U.S. Constitution by losing or destroying *Brady*[50] materials of which appellant requested disclosure. The Supreme Court has held that the government's "failure to preserve potentially useful evidence" does not violate due process unless the defendant shows that the loss of the evidence resulted from "bad faith on the part of the police."[51] Appellant presents no evidence that the police acted in bad faith. Points of error fifteen and sixteen are overruled.

---

[48] *Manns v. State*, 122 S.W.3d 171 (Tex. Crim. App. 2003).

[49] *Id.* at 180 (citing *Kuhlmann v. Wilson*, 477 U.S. 436, 91 L. Ed. 2d 364, 106 S. Ct. 2616 (1986)).

[50] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[51] *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281, 289 (1988); *Pena v. State*, 191 S.W.3d 133, 134, 138 (Tex. Crim. App. 2006).

In point of errors seventeen and nineteen, appellant contends that the trial court erred in denying a motion to suppress all evidence seized as a result of his detention and arrest because neither reasonable suspicion nor probable cause existed. A police officer may lawfully conduct a temporary detention if there is reasonable suspicion to believe that the detained person is violating the law.[52] Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has, or soon will be, engaged in criminal activity.[53] In making this determination, we consider the totality of the circumstances.[54]

An arrest is valid under Texas law if the arresting officer had probable cause with respect to the person being arrested as well as statutory authority to make the arrest.[55] If the officer does not have a warrant, he still has statutory authority under Article 14.04 where it is shown by satisfactory proof, "upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant."[56] For the purposes of this test, the statutory requirement of "satisfactory proof" is equivalent to the constitutional requirement of probable cause.[57] Probable cause exists if the officer knows of facts that would lead a reasonable

---

[52] *Ford v. State*, 158 S.W.3d 488, 492 (2005).

[53] *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

[54] *Ford,* 158 S.W.3d at 492; *Garcia*, 43 S.W.3d at 530.

[55] *Parker v. State*, 206 S.W.3d 593 (Tex. Crim. App. 2001)(citing *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991); *State v. Ballard*, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999)(citing *New York v. Harris*, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990)).

[56] Article 14.04.

[57] *Hughes v. State*, 24 S.W.2d 528, 531 (Tex. Crim. App. 2000).

person to believe that the suspect has committed or will soon commit a crime.[58]  In the context of

Article 14.04, "satisfactory proof" also goes to "escape," which is not necessarily a crime.

As with any suppression issue, we accord almost total deference to the trial court's

determination of the historical facts, especially if those determinations turn on witnesses' credibility

or demeanor.[59]  When, as in this case, the trial court has not made specific findings of fact, we must

view the evidence in the light most favorable to the trial court's ruling.[60]  We review *de novo* the trial

court's application of law to facts not turning on credibility or demeanor.[61]

Officers Miguel Gonzalez and Greg Blockley had received information about the possible

kidnapping of Ms. Tilly.  They knew that her credit cards had been used at a particular area just off

the highway by a thin, black man about six feet tall and a black woman with a white Ford pickup

truck.  The officers observed appellant at that same location and noticed that he satisfied the

description in that he was a tall, thin, black man.  When they saw him, the truck's door was open and

the motor was running.  While driving around the area, the officers made eye contact with appellant.

Once appellant noticed the officers, he suddenly appeared very nervous.  He walked away from the

vehicle while the motor was still running and the door was open.  In so doing, appellant had left a

number of valuable items, such as computer equipment and luggage, in the truck and in plain view

to anyone who might have happened to be in the motel parking lot.  The officers continued to

---

[58] *State v. Ballard*, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999)(citing *Smith v. State*, 739 S.W.2d 848, 851 (Tex. Crim App. 1987)).

[59] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[60] *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

[61] *Guzman*, 955 S.W.2d at 89.

observe appellant walk from the parking lot to the motel building, and walk up and then down the outdoor motel stairs. This whole time, the officers noticed that appellant was "closely" watching the police car. The officers saw him communicating with a black female. Then the officers saw the female approach the vehicle and stand by the passenger side.

The officers eventually stopped, exited their car, identified themselves as police officers to appellant, and began asking him questions. Appellant initially answered the questions, telling the officers that the vehicle was his and that he was staying in the motel. When Officer Gonzalez asked appellant for some form of identification, however, he did not answer but instead started to run away. The officers immediately alerted dispatch of appellant's flight and ran after him, deliberately staying a significant distance behind because they believed they had observed him reaching for a weapon near his waistband. They eventually caught up to him and arrested him for fleeing the police.

In light of these facts, the officers had reasonable suspicion to support detaining appellant in the parking lot. Appellant asserts in his brief that the officers had observed no suspicious behavior or evidence of criminal activity and "merely desired to identify" him. In fact, though, the evidence reveals ample reason for the officers to have concluded that appellant had been engaged in criminal activity. The location, appellant's general description, his contact with a black female, and his vehicle all matched the description the officers had been given of the suspect in their missing-person investigation. Appellant reacted to the police by acting nervous and leaving his truck unattended while the engine was running, the door was open, and valuable items were inside. Taken together, these facts provided the police with specific articulable facts that, when combined with reasonable inferences from those facts, would lead a reasonable person to suspect that appellant had committed the offense they were investigating.

Once appellant refused to identify himself and attempted to escape from the police while appearing to reach for a weapon, the officers had further reason to suspect that he had committed or was about to commit a crime. This attempt to escape compounded the above evidence that he had committed a crime, providing satisfactory proof that he had committed a felony and was about to escape—indeed, was already escaping— so that there was no time to procure a warrant. Points of error seventeen and nineteen are overruled.

In point of error eighteen, appellant contends that the trial court erred in admitting evidence seized from the warrantless search of his automobile. Evidence seized by the police without a warrant may be admitted only if an exception to the Fourth Amendment's warrant requirement applies.[62] A defendant challenging the admission of evidence on the basis of the Fourth Amendment bears the initial burden to prove that the search occurred without a warrant.[63] If the defendant meets this burden, the burden then shifts to the State to prove that an exception applies.[64]

One such exception holds that the police may lawfully search an automobile if they have probable cause to believe that the vehicle contains evidence of a crime.[65] Probable cause to search exists when there is a "fair probability" of finding inculpatory evidence at the location being searched.[66] If this exception applies, then the police may search "every part of the vehicle and its

---

[62] *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App 2003)(citing *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993).

[63] *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

[64] *Id.*

[65] *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).

[66] *Id.* at 24 n.29 (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1982)).

contents that may conceal the object of the search."[67]

The record shows the following facts relevant to this point of error: After appellant had fled Officers Gonzalez and Blockley but before the arrest, Officer Gonzalez informed Officers Bill Day and Sylvia Espino of the situation and led them to appellant's truck while Officer Blockley stayed on lookout in the motel area. Officer Day testified that once he arrived at the scene, he searched the truck and found numerous items, including luggage, jewelry, makeup, a laptop computer, a lawnmower, tools, liquor bottles, appellant's pay stub, laundry detergent, and a bag of wet clothing. He lifted one of the luggage tags and saw that it was labeled, "Diane Tilly." Photographs of the contents of the truck were admitted into evidence at trial.

We have already explained above that the police had probable cause to arrest appellant because a reasonable person would believe he had likely committed a crime or would soon commit a crime. The investigation itself was based on information leading the police to suspect that appellant had kidnapped Ms. Tilly. The officers had reason to believe that the truck belonged to appellant because they had observed him and the other suspect, Cruz, standing next to it, and because the truck matched the description the officers had received. Taken together, these facts would have caused a reasonable person to believe that the Ford was appellant's truck and that it would likely have contained evidence of a crime committed against Ms. Tilly, such as weapons or her personal belongings. While appellant may be correct in noting that it was physically impossible to read Ms. Tilly's luggage tags without entering the car and turning them over, it is unsurprising, based on all the information the police had at that point, that the luggage turned out to belong to her. We conclude that the State has met its burden to show that officers had probable cause to search the

---

[67] *United States v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

truck and that the warrantless search was thus valid under the automobile exception.

Appellant further argues that there was no concern that the evidence in the truck would be destroyed or lost because appellant and Cruz were already in policy custody. The automobile exception, however, does not require exigent circumstances.[68] Point of error eighteen is overruled.

In points of error twenty and twenty-one, appellant contends that the trial court erred in admitting evidence seized from his motel room without a search warrant.

Having learned from the front desk of the motel that a black man and girl were staying in a room on the second floor, Officers Bill Day and Sylvia Espino knocked on two doors of occupied rooms on the second floor to try to find appellant's room. Cruz answered the door, and police recognized her as the person with whom appellant had communicated in the parking lot. She repeatedly yelled, "I'm a minor!" Cruz told the police that they could confirm that she was a minor by asking her mother, with whom she claimed she was talking on the phone at the time. The police immediately handcuffed her. Cruz told the officers that there was a handgun under a mattress in the room and that ammunition cartridges were inside her boots. The officers retrieved these items from those locations. The officers also retrieved from Cruz's purse appellant's identification card for Blockbuster video rental store.

The trial court admitted all of these items into evidence at trial. A ballistics expert who had examined some of the spent cartridges from the scene of the murder testified that they had all been fired from a gun other than the one found in the motel room. This evidence was supported by Cruz's

---

[68] *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999); *State v. Guzman,* 959 S.W.2d 631, 633 (Tex. Crim. App. 1998)("[A] vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search." (quoting *United States v. Johns*, 469 U.S. 478, 484, 105 S. Ct. 881, 83 L. Ed. 2d 890 (1985))).

testimony that appellant insisted that they use Ms. Tilly's own gun to kill her, rather than the gun that they would later leave under the mattress, because appellant believed that the latter gun would be too easy for the authorities to trace.

In addition, the prosecutor questioned Cruz about how she used the gun seized from the motel room to hold up Ms. Tilly. The prosecutor handed the gun to her, and she indicated the manner in which she had held the gun as she told Ms. Tilly to get down on the ground.

The State argued at trial that exigent circumstances justified the entry of the room because the police were investigating a report of a missing person. The State also contends on appeal that the search was valid as a search incident to a lawful arrest. Appellant does not address either of these arguments, but instead argues that the consent exception to the warrant requirement does not apply.

The State further contends that any error in admitting the evidence was harmless. Appellant does not address the question of harm.

The police may search a defendant's residence without satisfying the Fourth Amendment's general requirement of a warrant if they have exigent circumstances and probable cause to search the residence.[69]

Assuming, without deciding, that the trial court erroneously admitted the items retrieved from the hotel room, we will conduct a harm analysis. If we find, beyond a reasonable doubt, that a constitutional error did not contribute to the verdict, then the error was harmless such that we will not reverse the judgment.[70] To make this determination, we must "calculate, as nearly as possible,

---

[69] *Gutierrez v. State*, 221 S.W.3d 680 (Tex. Crim. App. 2007).

[70] TEX. R. APP. P. 44.2(a).

the probable impact of the error on the jury in light of the other evidence."[71]  The error was not harmless if there is a reasonable likelihood that it materially affected the jury's deliberations.[72]

Our review of the record shows that in briefly examining Cruz about how she used the gun, the State was adding one more vivid detail to the much larger story of the events surrounding the murder.  Seeing appellant's accomplice actually handle the weapon and mimic her own past actions may have added a dramatic flourish at trial, but was not essential to the State's case.  The ballistics expert specifically ruled out the gun as the murder weapon.  The Blockbuster card was of little significance .  In light of the other overwhelming evidence, we find, beyond a reasonable doubt, that the evidence seized from the motel room did not contribute to the verdict.  Points of error twenty and twenty-one are overruled.

In point of error twenty-two, appellant contends that the trial court erred in admitting Cruz's confession because it was obtained in violation of due process.  In point of error twenty-three, appellant contends that the trial court erred in failing to submit an Article 38.23 charge to the jury on the confession.  A defendant has no standing to raise a constitutional challenge to another person's confession.[73]  The same rule applies in the context of Article 38.23.[74]  Appellant lacks standing to raise either a constitutional challenge or a statutory challenge to the  legality of Cruz's statement.  And lacking standing, he was not entitled to an Article 38.23 instruction regarding the

---

[71] *Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003) (quoting *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001), *cert. denied*, 536 U.S. 972, 153 L. Ed. 2d 862, 122 S. Ct. 2693 (2002)).

[72] *McCarthy*, 65 S.W.3d at 55.

[73] *McMahon v. State*, 582 S.W.2d 786, 790 (Tex. Crim. App. 1978).

[74]  *Fuller v. State*, 829 S.W.2d 121, 202 (Tex. Crim. App. 1992).

confession. Points of error twenty-two and twenty-three are overruled.

In points of error twenty-four and twenty-five, appellant contends that the trial court erred in admitting surveillance videotapes and ATM receipts because they were not properly authenticated pursuant to Texas Rule of Evidence 901(a). We do not reverse a ruling based on nonconstitutional error that does not affect "substantial rights."[75] If, after examining the record as a whole, we determine that any error had a slight or no effect on the jury, then we will not overturn the trial court's ruling.[76] We have observed that "the presence of overwhelming evidence of guilt plays a determinative role" in this analysis.[77] Assuming without deciding that the trial court erred in admitting the surveillance videotapes or ATM receipts, such error was harmless in light of the overwhelming evidence of guilt shown by other evidence detailed above in our analysis of the sufficiency of the evidence under points of error eleven and twelve. Points of error twenty-four and twenty-five are overruled.

We affirm the judgment of the trial court.

Filed: June 18, 2008
Publish

---

[75] TEX. R. APP. P. 44.2(b).

[76] *Morales v. State*, 32 S.W.3d 862, 867 (quoting *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

[77] *Motilla v. State*, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002) (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)).