

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

---

**NOS.**  **2-09-104-CR**
**2-09-105-CR**
**2-09-106-CR**
**2-09-107-CR**

---

HERSCHEL JEROME HURD                                                                                              APPELLANT

V.

THE STATE OF TEXAS                                                                                              STATE

-----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

Appellant Herschel Jerome Hurd appeals his convictions for one count of

aggravated robbery with a deadly weapon and three counts of aggravated assault

with a deadly weapon.[2] In two issues, he contends that the trial court erred by failing

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Penal Code Ann. § 22.02(a)(2) (Vernon Supp. 2009), § 29.03(a)(2) (Vernon 2003). Aggravated robbery is a first-degree felony; aggravated assault, as charged in this case, is a second-degree felony. *See id.* §§ 22.02(b), 29.03(b).

to suppress evidence related to the victim's identification of him and by failing to suppress evidence obtained as the result of an allegedly unlawful execution of his arrest warrant. We affirm.

**Background Facts**

In 2005, the State filed three indictments against appellant for aggravated assaults that occurred on the same day in October 2004; the indictments alleged that appellant struck someone with a club or bat that qualified as a deadly weapon. Appellant pled guilty to each indictment. The trial court deferred its adjudication of appellant's guilt in each case and placed him on ten years' community supervision.

A few years later, in April 2008, Ibrahim Soliman was working as a cashier at Quick Food Grocery in Arlington when a customer entered the store wearing white gloves and sunglasses. The customer walked around the counter toward the cash register, commanded Soliman to open the register, held a silver gun to Soliman's face, took about $200, and left the store. Soliman feared for his life.

Arlington Police Department Detective Anthony Wright arrived at the crime scene and met with Soliman, who came to the United States from Egypt and speaks only some English. Detective Wright reviewed video surveillance from Quick Food Grocery and noticed that the robber was a black male who had a light skin tone and medium body size. He also saw that the robber used a chrome gun and wore a dark "do-rag," sunglasses, shorts with a distinctive pattern, and white gloves. Video surveillance from a restaurant located next to Quick Food Grocery showed that a

2

mid-sized dark car had parked close to the grocery store near the time of the robbery, that someone who appeared to look like the robber had stepped out of the car, and that the car left after the time that the robbery occurred.

Detective Wright prepared a photographic spread that contained mug shots of six people, and six days after the robbery occurred, Soliman selected appellant as the robber.[3] The police got a warrant for appellant's arrest. To execute the warrant, they first went to an Arlington address listed on one of appellant's identification cards and found appellant's father but not appellant. Appellant's father took the police to a Grand Prairie apartment where appellant was staying. Courtney Gibbs, appellant's girlfriend, answered the door. The police determined that appellant was inside the apartment, entered inside, and arrested him.

A grand jury indicted appellant with committing aggravated robbery against Soliman. The indictment contained a repeat offender notice stating that appellant had previously been convicted of a felony. Appellant moved to suppress any in-court identification of him by Soliman and any evidence the police gathered as a result of his allegedly illegal arrest. The State petitioned the trial court to proceed to adjudication of guilt in each of appellant's aggravated assault cases on the basis that

---

[3] Detective Wright testified in a pretrial hearing that appellant became a suspect based on information that another police department provided.

he had committed a new offense by possessing a firearm within five years of his release from confinement following a felony conviction.[4]

At his trial, appellant pled not guilty to aggravated robbery and not true to the State's petitions to proceed to adjudication in the aggravated assault cases. The jury convicted appellant of aggravated robbery, and after the jury received evidence from several witnesses related to appellant's punishment, it assessed fifty years' confinement.[5] The trial court sentenced him accordingly. It also revoked his community supervision in the three aggravated assault cases, found him guilty of each of those charges, and sentenced him to twenty years' confinement on each charge to run concurrently with his other sentences. Appellant filed notices of appeals on all cases.

## Appellant's Arrest

In his second issue, appellant contends that the trial court abused its discretion by denying his motion to suppress evidence obtained as the result of an allegedly unlawful entry into the Grand Prairie apartment when the police arrested him.[6] We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim.

---

[4] *See* Tex. Penal Code Ann. § 46.04(a)(1) (Vernon Supp. 2009).

[5] Appellant pled true to the repeat offender notice of his indictment.

[6] We will resolve appellant's second issue first because the admissibility of the evidence that the police obtained after appellant's arrest affects our disposition of appellant's first issue.

4

App. 2007); *Orr v. State*, 306 S.W.3d 380, 398 (Tex. App.—Fort Worth 2010, no pet.). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Orr*, 306 S.W.3d at 398. The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *Orr*, 306 S.W.3d at 398.

Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Johnson*, 68 S.W.3d at 652–53. Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV; *see State v. Powell*, 306 S.W.3d

5

761, 765 (Tex. Crim. App. 2010). We have explained that the "right of a man to retreat into his own home and to be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment." *Green v. State*, 78 S.W.3d 604, 608–09 (Tex. App.—Fort Worth 2002, no pet.) (citing *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961)).

Thus, absent exigent circumstances or consent, police may not enter a residence under an arrest warrant for a nonresident without first obtaining a search warrant. *Steagald v. United States*, 451 U.S. 204, 205–06, 101 S. Ct. 1642, 1644 (1981); *Hudson v. State*, 662 S.W.2d 957, 958 (Tex. Crim. App. 1984). However, an arrest warrant authorizes entry into a defendant's own residence when there is reason to believe that the defendant is within. *Payton v. New York*, 445 U.S. 573, 602–03, 100 S. Ct. 1371, 1388 (1980) (explaining that if there "is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified," the police may "require him to open his doors"); *Reno v. State*, 882 S.W.2d 106, 108 (Tex. App.—Fort Worth 1994, pet. ref'd); *see also Morgan v. State*, 963 S.W.2d 201, 204 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (explaining that if the suspect is a co-resident of a third party, then *Steagald* does not apply, and *Payton* allows the arrest of the subject under an arrest warrant). An officer's reasonable belief, considering all the circumstances known to the officer, that a residence is the defendant's and that the defendant is inside authorizes entry into the residence to arrest the defendant under an arrest warrant; the officer's belief

6

does not have to be proven correct. *See Green*, 78 S.W.3d at 611–14; *Morgan*, 963 S.W.2d at 204.

Thus, appellant concedes that if the police had a reasonable belief that he lived at the Grand Prairie apartment where he was arrested, the "arrest warrant alone would support entrance into the apartment." However, he contends that he did not reside in Grand Prairie but was only Gibbs's houseguest; therefore, he claims that all evidence resulting from his allegedly unlawful arrest should have been suppressed.

At a pretrial hearing on appellant's motion to suppress, Detective Wright testified that after he obtained appellant's arrest warrant, he discovered an Arlington apartment address on appellant's identification card and went with other officers to that address "as a starting point . . . to determine what [appellant's] current address was." According to Detective Wright, appellant's father answered the door and said that appellant did "not live there" but instead lived "in an apartment in Grand Prairie with his girlfriend, Courtney Gibbs" and that appellant "would be at that apartment."

Appellant's father went to the Grand Prairie apartment with the police. The police knocked on the door and Gibbs answered, at which time officers removed her from the front of the doorway, went into the apartment, and called out for appellant, who was in a bedroom. The officers told appellant about his arrest warrant, and according to Detective Wright, appellant told him that he lived at that apartment and refused to give the officers consent to search it. Detective Wright secured a search

7

warrant for the apartment and found items connecting appellant to Soliman's robbery.

Appellant called his father and Gibbs to testify at the hearing. Appellant's father testified, among other facts, that

- when the police arrived in Arlington, they searched his apartment and went into appellant's room;

- he told the police that appellant was "probably at his girlfriend's house" because appellant stayed there overnight occasionally;

- appellant did not live at the Grand Prairie apartment because he spent most nights in Arlington and gave his father money for rent and food;

- appellant worked at the same place as his father, and his father would sometimes (about twice per week) pick appellant up at the Grand Prairie apartment before work after he had stayed with Gibbs overnight;

- on other mornings (about once per week), Gibbs would take appellant to work after he had stayed overnight with her; and

- he does not recall telling the police that appellant lived with Gibbs.

Gibbs testified to the following facts:

- appellant visited her at her apartment three or four times per week and had brought some of his possessions to her apartment because he was her boyfriend, but appellant did not live with her and was not going to stay with her overnight on the night of his arrest;

- appellant's name is not on her lease contract;

- appellant did not help her with rent and did not have a key to her apartment; and

- she wrote a love letter to appellant three days before appellant's arrest that included the words, "We wake up to each other everyday,"

8

although she said that the letter was exaggerated and she did not literally wake up with him every morning.

Obviously, these witnesses' testimony required the trial court to resolve conflicting evidence. At the conclusion of the suppression hearing, the trial court specifically found that the witnesses appellant called were not credible, and the court therefore denied appellant's motion.

As explained above, we must defer to the trial court's credibility determination and its resolution of conflicting evidence. *See Amador*, 221 S.W.3d at 673; *Orr*, 306 S.W.3d at 398, 400. If the trial court believed Detective Wright's testimony that before the police entered the Grand Prairie apartment, appellant's father told them that appellant did not live with him but instead lived with Gibbs, we must defer to the trial court's rejection of the conflicting evidence offered by appellant's witnesses in that regard. Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the trial court could have justifiably determined that the police reasonably believed that appellant resided at the Grand Prairie apartment where they executed the arrest warrant.[7] *See Wiede*, 214 S.W.3d at 24; *Green*, 78 S.W.3d at 611–14; *Morgan*, 963 S.W.2d at 204. We uphold both the trial court's implicit

---

[7] Appellant does not expressly challenge whether the police had a reasonable belief that appellant was in the Grand Prairie apartment when the police executed the warrant. We note that even if the trial court had found Gibbs's testimony credible while finding appellant's father's testimony not credible, the officers did not have the benefit of Gibbs's opinion as to whether appellant resided with her at the time that they chose to enter the apartment. Thus, the facts that she testified to cannot defeat their reasonable belief that appellant lived there.

determination that the police constitutionally entered the apartment to arrest appellant and the court's explicit denial of appellant's motion to suppress the evidence obtained as a result of his arrest. We overrule appellant's second issue.

**Soliman's Identification of Appellant**

In appellant's first issue, he argues that the trial court erred by denying his motion to suppress Soliman's in-court identification. He asserts that the in-court identification was based on a pretrial identification procedure that was allegedly impermissible and suggestive because (1) Detective Wright used a photographic array on one sheet of paper rather than a sequential photographic lineup procedure, (2) Soliman understood little English and Detective Wright did not use an interpreter, (3) Detective Wright may not have told Soliman that the suspect may or may not have been included in the photographic array, and (4) Soliman had a shaky recollection at trial of what appellant was wearing during the robbery. *See Gamboa v. State*, 296 S.W.3d 574, 581–82 (Tex. Crim. App. 2009); *Stewart v. State*, 198 S.W.3d 60, 62 (Tex. App.—Fort Worth 2006, no pet.).

Assuming without deciding that appellant's due process rights were violated by the admission of Soliman's identification testimony, we would be required to determine whether the trial court's admission of the testimony caused harm.[8] *See* Tex. R. App. P. 44.2(a); *Wheat v. State*, 178 S.W.3d 832, 833 (Tex. Crim. App.

---

[8] It is the "responsibility of the appellate court to assess harm." *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001).

10

2005) (stating that except for "structural" errors, no error is categorically immune from a harm analysis); *Ledesma v. State*, 828 S.W.2d 560, 563 (Tex. App.—El Paso 1992, no pet.); *Cabello v. State*, 655 S.W.2d 293, 296 (Tex. App.—Corpus Christi 1983, no pet.) ("[I]f the admission of Mejia's identification testimony could be considered error, it was harmless, in light of the unimpeached and uncomplained of identification of the appellant by Officer Garza."); *see also Perez v. State*, No. 03-07-00606-CR, 2009 WL 2195417, at *5 (Tex. App.—Austin July 23, 2009, no pet.) (mem. op., not designated for publication) ("We need not determine whether the procedures used were impermissibly suggestive such that they created a substantial likelihood of misidentification because, even assuming that Perez could prevail on this argument, any error is harmless.").

When we review constitutional error, we "must reverse a judgment of conviction or punishment unless [we determine] beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). To make this determination, we should calculate the probable impact of the error on the jury in light of the other evidence; the error is not harmless if there is a reasonable likelihood that it materially affected the jury's deliberations. *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009). Stated another way, we must determine whether there is a reasonable probability that the illegally obtained and wrongly admitted evidence "moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Langham*

11

*v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010); *see Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (explaining that the "question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at th[e] verdict").

Soliman's testimony that identified appellant as the robber is cumulative of other evidence, including his own father's testimony, that identified him as such. During the trial, appellant's father testified that when the police came to his house to look for appellant, they showed him a photograph. The photograph was likely the same as a photograph that Soliman identified at trial as being captured from the video surveillance of the robbery.[9] Appellant's father told the police that he recognized appellant in the photograph.[10]

Also, while being questioned by Detective Wright after his arrest, appellant asked Detective Wright if he could "work out some kind of deal."[11] Later during the

---

[9] Appellant's father said that the photograph that the State's attorney showed to him during the trial, taken from the video surveillance of the robbery, was similar to the photograph that he saw on the date of appellant's arrest because the picture showed appellant walking toward a convenience store's counter, and the convenience store looked the same in both pictures.

[10] While trying to persuade the trial court to exclude appellant's father's testimony that identified appellant in the photograph, appellant's trial counsel stated that admission of the testimony took "away all defensive theory" and "practically amount[ed] to an instruction from the State to find [appellant] guilty."

[11] The video of appellant's interrogation shows him slouched with his hands over his face on many occasions as Detective Wright attempted to gain appellant's confession.

interrogation, Detective Wright pointed to a picture from the robbery and asked appellant, "What caused this, man?" Appellant responded, "Too much stress. Way too much stress, man." Next, in response to Detective Wright's telling appellant, "This is a mistake," appellant said, "I know that, sir, . . . I was too stressed out and got fed up . . . and needed money." Finally, toward the end of the interrogation, when Detective Wright asked appellant what he was thinking about on the night of the robbery, appellant admitted to being "nervous" and "shaking" and stated that he had "never really robbed somebody at gunpoint like that" and that he "didn't even want to go do it, man."

Along with appellant's father's testimony and appellant's inculpatory statements during his interrogation, the following evidence also links appellant to the robbery:

- appellant's black and white athletic shoes that he put on when he was arrested are "very similar" to shoes that Detective Wright saw in the video of the robbery;

- appellant's earrings that he was wearing when he was arrested look like the earrings that the robber wore;

- the black "do-rag" that appellant was wearing when he was arrested looks like the "do-rag" that the robber wore;

- Gibbs's dark car that the police discovered while arresting appellant looks like the car from video taken from the restaurant located next to Quick Food Grocery;

- a loaded, silver/chrome gun that was found upon execution of the search warrant at the Grand Prairie apartment looks like the gun from the robbery;

13

- a pair of long male's shorts found in the Grand Prairie apartment that have a distinctive design on them and a hanging symbol from a belt loop appear to match corresponding features of shorts the robber wore; and

- the police found white gloves in a bedroom of the Grand Prairie apartment that appear to match the white gloves that the robber wore.[12]

Based on all of this evidence that links appellant to the offense, we cannot conclude that there is a reasonable probability that Soliman's identification of appellant as the robber "moved the jury from a state of non-persuasion to one of persuasion" regarding whether he was the robber. *See Langham*, 305 S.W.3d at 582. Instead, we hold that Soliman's identification of appellant did not likely materially affect the jury's deliberation. *See Neal*, 256 S.W.3d at 284.

Thus, after carefully reviewing the record, we hold that even if the trial court erred by overruling appellant's motion to suppress Soliman's in-court identification of him, then beyond a reasonable doubt, such error did not contribute to his conviction or punishment. *See* Tex. R. App. P. 44.2(a). We overrule appellant's first issue.

---

[12] We note that appellant's identification as the robber did not seem to be the biggest issue at trial; appellant's counsel spent almost his entire closing argument talking about alleged violations of appellant's constitutional rights.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgments.[13]


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 1, 2010

---

[13] Although appellant filed notices of appeal in each of his three aggravated assault cases, neither of his issues directly contest the trial court's revoking his community supervision and finding him guilty in those cases.  To the extent that appellant's appeals of his aggravated assault convictions are dependent on his appeal of his aggravated robbery conviction, we must affirm the aggravated assault convictions for the reasons stated above.