

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-114-CR

ANTOINE DEVON WHITE                                     APPELLANT

V.

THE STATE OF TEXAS                                            STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Antoine Devon White appeals his conviction for murder. In one issue, White argues that the evidence is legally and factually insufficient to sustain his conviction. We will affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. BACKGROUND

David McDowell was a cab driver in Wichita Falls. He was working the night shift around 3:30 a.m. on November 3, 2006, when he took a call to pick up some passengers at an apartment on Humphreys Street. He picked up White, White's girlfriend Latasha Brigham, and their three-month-old son and drove them to Latasha's apartment on Professional Drive. White and Latasha got into an argument at the apartment, and at around 5:00 a.m., McDowell picked up White at Latasha's apartment and drove him back to the apartment on Humphreys Street. McDowell radioed to his shift supervisor Thomas Terry that he was taking a passenger back to where he had picked him up on Humphreys Street.

Later that morning, Terry tried to radio to McDowell to have him pick up other passengers, but McDowell did not answer. Terry drove to the Humphreys Street address to look for McDowell and found his van running with the driver's door open and the headlights on. Terry called the police. While waiting for the police to arrive, Terry drove closer to the van and saw McDowell slumped over in the driver's seat of the van.

Police arrived and found McDowell dead in his van. There was a large pool of blood and money in the street by the driver's side. McDowell had been cut and stabbed approximately eighteen times. The police went to the

2

Humphreys Street apartment where McDowell had delivered his last customer and spoke with Latasha's sister Monnica Brigham, who lives at the apartment with her husband and children. The police then went to Latasha's apartment, and Latasha agreed to go to the police station to give a statement.

The police searched for White for several days. They received information that he was staying at an apartment on Bridwell Street and, on November 9, 2006, got a search warrant to search the Bridwell Street apartment. They did not find White but they seized several items of evidence, including a disassembled pocket knife.[2] Later that day, DPS Trooper Veronica Garcia was traveling on Highway 82 in Lorenzo, Texas, approximately 180 miles west of Wichita Falls, when she saw a man walking west toward Lubbock. She stopped because she thought the man was walking too close to the fog line. White asked the trooper for a ride to Lubbock, approximately nineteen miles away. Trooper Garcia told White that she would drive him to a nearby truck stop but that he had to identify himself and empty his pockets before he could get in her car. White obliged, but Trooper Garcia still saw bulges in his pockets so she patted him down. She found a newspaper article in his pocket that appeared to have his photo on it. Trooper Garcia asked

_____

[2] The dissassembled pocketknife tested negative for the presence of blood.

3

dispatch to run White's information, confirmed that he had a warrant for his arrest, and arrested him.

White was tried for McDowell's murder. At his trial, Monnica, Latasha, and Monnica's brother-in-law Terrence Arps testified that on the night of November 2, 2006, they were at Monnica's apartment on Humphreys Street. They all testified that White went to Monnica's apartment that night and got into an argument with Latasha and Terrence because he thought Latasha had been "talking to" Terrence. Latasha testified that White accused her and Terrence of sleeping together and that, at one point, White said that somebody is going to end up getting hurt. White left, but he returned to the apartment and, at around 3:00 a.m., he woke up Latasha and told her they were going home. Latasha called a cab. Latasha explained that White often got jealous of her and that, during the cab ride, White got mad at her and "gave [her] a look" that he typically gave when he was jealous because she was conversing with the cab driver. Latasha testified that White left her apartment at around 5:00 a.m., that she saw headlights, but that she did not know if he left in a cab.

Monnica, Terrence, and Latasha all testified that they had seen White with a large knife that had brass knuckles on it on the night of November 2, 2006. Monnica described it as "machete-looking" with about a 12–14" blade, and Terrence described it as "a Jim Bowie" knife with a curved blade.

4

Tarrant County Deputy Chief Medical Examiner Dr. Marc Krouse testified about the results of his autopsy on McDowell's body. He opined that the cuts and stabs on McDowell's body resulted from a long, narrow, sharp object with a single edge, such as a steak knife or pocketknife. He testified that the wounds were consistent with one knife, although he could not eliminate the possibility that more than one knife was used. He explained that six of McDowell's wounds were consistent with an attack from behind.

Christopher Reynolds testified that he was in jail in Wichita Falls in a cell next to White for a couple of weeks in December 2006. Reynolds had never met White before, and the two men talked about how they were both from Virginia. Reynolds testified that White told him that he killed McDowell and about the events leading up to and after McDowell's murder. Reynolds wrote down what White told him and sent it to his attorney. According to Reynolds, White said that he and Latasha had taken a cab from Latasha's cousin's apartment on Humphreys Street[3] to Latasha's apartment and that White had decided to take the cab back to the Humphreys Street apartment to look for Terrence. In the cab on the way back to the apartment on Humphreys Street, White "decided that he would take the cab driver for what he had on him."

---

[3] Reynolds testified that Latasha's cousin lived at the Humphreys Street apartment, but in fact, Latasha's sister lived there.

5

White told Reynolds that he decided to rob the cab driver so that he could "re-up," which meant to purchase more drugs to sell. White told Reynolds that the cab driver "didn't see it coming" and that he "ended up in the passenger seat and took control of the situation just before they got to Humphreys." Reynolds testified that White laughed at times when telling him about the murder, "particularly whenever he said that the old man didn't ever see it coming."

White told Reynolds that after the murder, he "went and re-upped" and then went back to Latasha's apartment, where they got in a fight, so he packed some clothes and went to a friend's upstairs apartment in the same complex. When he saw the police go to Latasha's apartment, he called another friend to pick him up and take him to Lubbock. On the way to Lubbock, they stopped for gas, and he bought a newspaper with his photo on it; the friend found the newspaper and left White on the side of the road. White told Reynolds that he bought the paper to read later and to show his friends in Lubbock. He also told Reynolds that he had bagged up all the clothes from the night of the murder and dumped them at a rest stop.

Reynolds testified that he did not receive a deal for testifying and that he had already made a plea agreement prior to telling his attorney and the prosecutor what White had told him.

The jury convicted White for McDowell's murder and assessed his punishment at sixty years' imprisonment and a $7,500 fine. The trial court sentenced him accordingly.

## III. STANDARDS OF REVIEW

### A. Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.

7

*Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

### B. Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's

8

determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id.* We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id.* We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the

9

factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon,* 253 S.W.3d at 704.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

## IV. SUFFICIENCY OF THE EVIDENCE

In one issue, White argues that the evidence is legally and factually insufficient to convict him of murder because Reynolds's testimony was inconsistent with prior statements he made to police and other evidence presented at trial.

### A. Law on Murder

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (Vernon 2003).

### B. Legally Sufficient Evidence

White combines his legal and factual sufficiency claims, which are based almost entirely on the credibility of Reynolds's testimony. He even states,

"This case would be simple if Reynolds told one story regarding what the Appellant told him and then the facts at the crime scene corroborated the story." But White's credibility challenges are not relevant to our legal sufficiency review because we must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

White also argues that the evidence that White was carrying a large "machete" knife conflicts with Dr. Krouse's testimony that McDowell's wounds were caused by a small knife with about a 4" blade, such as a pocket knife. Regardless of this discrepancy between the knife White possessed and the knife purportedly used to murder McDowell, other evidence showed that White was the perpetrator of McDowell's murder. Reynolds testified that White told him that he killed a cab driver for drug money. Latasha testified that she, White, and their son took a cab to her apartment hours before McDowell's murder and that the cab driver looked like McDowell based on a photo taken at the crime scene and showed to her at trial. The cab company's shift manager testified that McDowell radioed to him that he was taking a passenger back to where he had picked him up on Humphreys Street.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found that the evidence at trial was sufficient to establish that White murdered McDowell. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. Accordingly, we hold that the evidence is legally sufficient to support White's conviction.

### C. Factually Sufficient Evidence

White argues that factually insufficient evidence exists to support his conviction because Reynolds's testimony was the primary evidence showing that White was the perpetrator of McDowell's murder but numerous inconsistencies existed between Reynolds's testimony, his statements to police, and other evidence at trial.

White first argues that Reynolds's testimony is inconsistent with the "physical evidence." Reynolds testified that White said he "ended up in the passenger seat and took control of the situation," but other evidence at trial showed that McDowell was attacked from behind.[4] Reynolds also testified that White told him that he knocked on Monnica's door after he killed McDowell.

---

[4] ... Dr. Krouse testified that six of McDowell's wounds were consistent with an attack from behind. Siobain Callahan, an identification technician for the Wichita Falls Police Department, testified that although she is not an expert in "cast off blood," it appeared that no one had been sitting in the front passenger seat of McDowell's van because that seat had no "smeared blood" patterns consistent with someone sitting on blood.

12

White argues that this testimony conflicts with evidence of boot prints found at the scene leading in a different direction than Monnica's apartment.

White next points to three alleged inconsistencies between Reynolds's testimony and his statements to his attorney and law enforcement:

> At one point, under oath, Reynolds testified that Appellant came up from behind McDowell. At trial, Reynolds testified that Appellant attacked him from the front passenger seat. In a [] separate story, Reynolds told law enforcement and the DA's Office that Appellant started in the back seat and then moved to the front seat.

> The inconsistencies didn't stop there. Reynolds testified that he heard the Appellant tell another inmate that [he had used] "a knife and not a crowbar." However, in all of his conversations with his attorney, law enforcement, and the DA's Office, Reynolds never told that version of his story.

> Additionally, Reynolds told two different stories regarding when Appellant decided to leave town. In his statements to law enforcement he stated that Appellant told him he decided to leave when he saw his name in the newspaper but when he testified he stated that Appellant said he left after he heard of the SWAT raid.

Regarding the first alleged inconsistency—whether White attacked Reynolds from behind or from the front passenger seat—Reynolds clarified any alleged inconsistency on cross examination, "My understanding is that it started whenever he was behind the driver, and as he took control of the situation he moved in the front passenger's seat. . . . He [White], more or less, stated that he'd come up from behind him, that the old man never saw it coming."

13

Regarding the second alleged inconsistency—concerning the weapon used by White—White mischaracterizes Reynolds's testimony. The following exchange took place at trial,

Q. When he was talking to you about the way that this all occurred, what did he tell you that he used as a weapon?

A. It wasn't ever really brought up. There was a mention of a crowbar, there was a mention of a knife, but there wasn't ever really anything specifically brought up.

Q. When did he talk about a crowbar?

A. He was actually talking to another inmate . . . because that inmate had said that — he had stated that he had heard that [White] had used a crowbar, and Mr. White said, ["]Well, I don't know anything about a crowbar.["]

Thus, Reynolds was testifying about what another inmate "had heard," not what White had said, and it is understandable that he had not mentioned this passing comment by another inmate in his previous statements to his attorney or law enforcement.

Finally, regarding any alleged inconsistency about when White had decided to leave town, Reynolds testified on cross examination that he told police that White said he left town when he saw his picture in the paper but agreed that White also said he left the apartment complex where Latasha lived when he saw police at her apartment. We agree with the State that both explanations are reasonable and that, consequently, no inconsistency exists.

14

Even assuming that portions of Reynolds's testimony were inconsistent with his prior statements or with other evidence presented at trial, the jury was free to believe some or all of the testimony. *See Lancon*, 253 S.W.3d at 706; *see also Fuentes v. State*, 991 S.W.2d 267, 271–72 (Tex. Crim. App.), *cert. denied*, 528 U.S. 1026 (1999) (noting that "to avoid intruding on the jury's role as arbiter of the weight and credibility of the evidence, a factual sufficiency review remains deferential to the jury's verdict").

White also asserts that Reynolds was not credible because he was a convicted felon, he had a bad reputation for truth and honesty, and "legal troubles were piling up on him in a number of different counties." White called two witnesses to testify that Reynolds had a reputation for being dishonest and untruthful. It was within the purview of the jury to determine the credibility of Reynolds's testimony and, as the sole judge of the witnesses's credibility, the jury could choose to believe some testimony and disbelieve other testimony. *See Lancon*, 253 S.W.3d at 704.

We have reviewed the evidence in a neutral light, and we find no objective basis in the record for holding that the jury's verdict was clearly wrong or manifestly unjust or that it was contradicted by the great weight and preponderance of the evidence. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Rather, the evidence presented at trial was sufficient

to support the verdict, and no contrary evidence exists that would render the evidence factually insufficient under the applicable standard of review. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Accordingly, we hold that the evidence is factually sufficient to support White's conviction.

Having held that the evidence is legally and factually sufficient, we overrule White's sole issue.

## V. CONCLUSION

Having overruled White's sole issue, we affirm the trial court's judgment.


SUE WALKER
JUSTICE

PANEL: LIVINGSTON, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 31, 2009