COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-114-CR

 

 

ANTOINE DEVON WHITE                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE 78TH DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

                                                    

                                              ------------

I. Introduction

Appellant Antoine Devon White appeals his conviction for
murder.  In one issue, White argues that
the evidence is legally and factually insufficient to sustain his
conviction.  We will affirm.

 

 








II. Background

David McDowell was a cab driver in Wichita Falls.  He was working the night shift around 3:30
a.m. on November 3, 2006, when he took a call to pick up some passengers at an
apartment on Humphreys Street.  He picked
up White, White=s girlfriend Latasha Brigham, and their
three-month-old son and drove them to Latasha=s apartment on
Professional Drive.  White and Latasha
got into an argument at the apartment, and at around 5:00 a.m., McDowell picked
up White at Latasha=s apartment and drove him back to the
apartment on Humphreys Street.  McDowell
radioed to his shift supervisor Thomas Terry that he was taking a passenger
back to where he had picked him up on Humphreys Street.  

Later that morning, Terry tried to radio to McDowell to
have him pick up other passengers, but McDowell did not answer.  Terry drove to the Humphreys Street address
to look for McDowell and found his van running with the driver=s door open and
the headlights on.  Terry called the
police.  While waiting for the police to
arrive, Terry drove closer to the van and saw McDowell slumped over in the
driver=s seat of the
van.  








Police arrived and found McDowell dead in his van.  There was a large pool of blood and money in
the street by the driver=s side. 
McDowell had been cut and stabbed approximately eighteen times.  The police went to the Humphreys Street
apartment where McDowell had delivered his last customer and spoke with Latasha=s sister Monnica
Brigham, who lives at the apartment with her husband and children.  The police then went to Latasha=s apartment, and
Latasha agreed to go to the police station to give a statement.  








The police searched for White for several days.  They received information that he was staying
at an apartment on Bridwell Street and, on November 9, 2006, got a search
warrant to search the Bridwell Street apartment.  They did not find White but they seized
several items of evidence, including a disassembled pocket knife.[2]  Later that day, DPS Trooper Veronica Garcia
was traveling on Highway 82 in Lorenzo, Texas, approximately 180 miles west of
Wichita Falls, when she saw a man walking west toward Lubbock.  She stopped because she thought the man was
walking too close to the fog line.  White
asked the trooper for a ride to Lubbock, approximately nineteen miles
away.  Trooper Garcia told White that she
would drive him to a nearby truck stop but that he had to identify himself and
empty his pockets before he could get in her car.  White obliged, but Trooper Garcia still saw
bulges in his pockets so she patted him down. 
She found a newspaper article in his pocket that appeared to have his
photo on it.  Trooper Garcia asked
dispatch to run White=s information, confirmed that he had a
warrant for his arrest, and arrested him. 


White was tried for McDowell=s murder.  At his trial, Monnica, Latasha, and Monnica=s brother-in-law
Terrence Arps testified that on the night of November 2, 2006, they were at
Monnica=s apartment on
Humphreys Street. They all testified that White went to Monnica=s apartment that
night and got into an argument with Latasha and Terrence because he thought
Latasha had been Atalking to@ Terrence.  Latasha testified that White accused her and
Terrence of sleeping together and that, at one point, White said that somebody
is going to end up getting hurt.  White
left, but he returned to the apartment and, at around 3:00 a.m., he woke up
Latasha and told her they were going home. 
Latasha called a cab.  Latasha
explained that White often got jealous of her and that, during the cab ride,
White got mad at her and Agave [her] a look@ that he typically
gave when he was jealous because she was conversing with the cab driver.  Latasha testified that White left her
apartment at around 5:00 a.m., that she saw headlights, but that she did not
know if he left in a cab.

Monnica, Terrence, and Latasha all testified that they had
seen White with a large knife that had brass knuckles on it on the night of
November 2, 2006.  Monnica described it
as Amachete-looking@ with about a 12B14"
blade,  and Terrence described it as Aa Jim Bowie@ knife with a
curved blade.








Tarrant County Deputy Chief Medical Examiner Dr. Marc
Krouse testified about the results of his autopsy on McDowell=s body.  He opined that the cuts and stabs on McDowell=s body resulted
from a long, narrow, sharp object with a single edge, such as a steak knife or
pocketknife.  He testified that the
wounds were consistent with one knife, although he could not eliminate the
possibility that more than one knife was used. 
He explained that six of McDowell=s wounds were
consistent with an attack from behind. 








Christopher Reynolds testified that he was in jail in
Wichita Falls in a cell next to White for a couple of weeks in December
2006.  Reynolds had never met White
before, and the two men talked about how they were both from Virginia.  Reynolds testified that White told him that
he killed McDowell and about the events leading up to and after McDowell=s murder.  Reynolds wrote down what White told him and
sent it to his attorney.  According to
Reynolds, White said that he and Latasha had taken a cab from Latasha=s cousin=s apartment on
Humphreys Street[3]
to Latasha=s apartment and that White had decided to
take the cab back to the Humphreys Street apartment to look for Terrence.  In the cab on the way back to the apartment
on Humphreys Street, White Adecided that he
would take the cab driver for what he had on him.@  White told Reynolds that he decided to rob
the cab driver so that he could Are-up,@ which meant to
purchase more drugs to sell.  White told
Reynolds that the cab driver Adidn=t see it coming@ and that he Aended up in the
passenger seat and took control of the situation just before they got to
Humphreys.@ 
Reynolds testified that White laughed at times when telling him about
the murder, Aparticularly whenever he said that the old
man didn=t ever see it
coming.@  

White told Reynolds that after the murder, he Awent and re-upped@ and then went
back to Latasha=s apartment, where they got in a fight, so
he packed some clothes and went to a friend=s upstairs
apartment in the same complex. When he saw the police go to Latasha=s apartment, he
called another friend to pick him up and take him to Lubbock.  On the way to Lubbock, they stopped for gas,
and he bought a newspaper with his photo on it; the friend found the newspaper
and left White on the side of the road. 
White told Reynolds that he bought the paper to read later and to show
his friends in Lubbock.  He also told
Reynolds that he had bagged up all the clothes from the night of the murder and
dumped them at a rest stop.   

Reynolds testified that he did not receive a deal for
testifying and that he had already made a plea agreement prior to telling his
attorney and the prosecutor what White had told him.   








The jury convicted White for McDowell=s murder and
assessed his punishment at sixty years= imprisonment and
a $7,500 fine.  The trial court sentenced
him accordingly.   

III. Standards of Review

A. Legal Sufficiency

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the prosecution in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).








This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Brown v. State, 270 S.W.3d 564, 568 (Tex. Crim. App.
2008), cert. denied, 129 S. Ct. 2075 (2009).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the factfinder. Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  Instead, we Adetermine whether the necessary inferences are reasonable based upon
the combined and cumulative force of all the evidence when viewed in the light
most favorable to the verdict.@  Hooper v. State, 214
S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The standard of review is the
same for direct and circumstantial evidence cases; circumstantial evidence is
as probative as direct evidence in establishing the guilt of an actor.  Clayton, 235 S.W.3d at 778; Hooper,
214 S.W.3d at 13.

B.  Factual
Sufficiency








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. Neal v. State, 256 S.W.3d
264, 275 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 1037 (2009);
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s
determination is manifestly unjust.  Lancon
v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204
S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the factfinder=s.  Johnson v. State, 23
S.W.3d 1, 12 (Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407
(Tex. Crim. App. 1997).  Unless the
record clearly reveals that a different result is appropriate, we must defer to
the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, unless we conclude that it is
necessary to correct manifest injustice, we must give due deference to the
factfinder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.  Our deference in this regard safeguards the
defendant=s right to a
trial by jury.  Lancon, 253 S.W.3d
at 704.     An
opinion addressing factual sufficiency must include a discussion of the most
important and relevant evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 

IV. Sufficiency of the Evidence

In one issue, White argues that the evidence is legally and
factually insufficient to convict him of murder because Reynolds=s testimony was
inconsistent with prior statements he made to police and other evidence
presented at trial.  

A. Law on Murder

A person commits murder if he intentionally or knowingly
causes the death of an individual or intends to cause serious bodily injury and
commits an act clearly dangerous to human life that causes the death of an
individual.  Tex. Penal Code Ann. ' 19.02(b)(1)B(2) (Vernon 2003).

 

B. Legally Sufficient Evidence








White combines his legal and factual sufficiency claims,
which are based almost entirely on the credibility of Reynolds=s testimony.  He even states, AThis case would be
simple if Reynolds told one story regarding what the Appellant told him and
then the facts at the crime scene corroborated the story.@  But White=s credibility
challenges are not relevant to our legal sufficiency review because we must
presume that the factfinder resolved any conflicting inferences in favor of the
prosecution and defer to that resolution. 
See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton,
235 S.W.3d at 778. 

White also argues that the
evidence that White was carrying a large Amachete@ knife
conflicts with Dr. Krouse=s testimony
that McDowell=s wounds
were caused by a small knife with about a 4" blade, such as a pocket knife.  Regardless of this discrepancy between the
knife White possessed and the knife purportedly used to murder McDowell, other
evidence showed that White was the perpetrator of McDowell=s murder.  Reynolds testified
that White told him that he killed a cab driver for drug money.  Latasha testified that she, White, and their
son took a cab to her apartment hours before McDowell=s murder and that the cab driver looked like McDowell based on a photo
taken at the crime scene and showed to her at trial.  The cab company=s shift manager testified that McDowell radioed to him that he was
taking a passenger back to where he had picked him up on Humphreys Street.  








        Viewing the evidence in the light most
favorable to the jury=s verdict,
we  hold that a rational trier of fact
could have found that the evidence at trial was sufficient to establish that White
murdered McDowell.  See Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.  Accordingly, we hold that the evidence is
legally sufficient to support White=s conviction.  

C. Factually Sufficient
Evidence

White argues that factually
insufficient evidence exists to support his conviction because Reynolds=s testimony was the primary evidence showing that White was the
perpetrator of McDowell=s murder but
numerous inconsistencies existed between Reynolds=s testimony, his statements to police, and other evidence at trial. 








White first argues that
Reynolds=s testimony is inconsistent with the Aphysical evidence.@  Reynolds testified that White
said he Aended up in the passenger seat and took control of the situation,@ but other evidence at trial showed that McDowell was attacked from
behind.[4]
 Reynolds also testified that White told him
that he knocked on Monnica=s door after he
killed McDowell.  White argues that this
testimony conflicts with evidence of boot prints found at the scene leading in
a different direction than Monnica=s apartment. 

White next points to three alleged inconsistencies between
Reynolds=s testimony and
his statements to his attorney and law enforcement:   

At one point, under oath, Reynolds
testified that Appellant came up from behind McDowell.  At trial, Reynolds testified that Appellant
attacked him from the front passenger seat. 
In a [] separate story, Reynolds told law enforcement and the DA=s Office that Appellant started in
the back seat and then moved to the front seat.

 

The inconsistencies didn=t stop there.  Reynolds testified that he heard the
Appellant tell another inmate that [he had used] Aa knife and not a crowbar.@ 
However, in all of his conversations with his attorney, law enforcement,
and the DA=s Office, Reynolds never told that
version of his story.

 

Additionally, Reynolds told two
different stories regarding when Appellant decided to leave town.  In his statements to law enforcement he
stated that Appellant told him he decided to leave when he saw his name in the
newspaper but when he testified he stated that Appellant said he left after he
heard of the SWAT raid.

 

Regarding the first alleged inconsistencyCwhether White
attacked Reynolds from behind or from the front passenger seatCReynolds clarified
any alleged inconsistency on cross examination, AMy understanding
is that it started whenever he was behind the driver, and as he took control of
the situation he moved in the front passenger=s seat. . . .  He [White], more or less, stated that he=d come up from
behind him, that the old man never saw it coming.@   








Regarding the second alleged inconsistencyCconcerning the
weapon used by WhiteCWhite mischaracterizes Reynolds=s testimony.  The following exchange took place at trial, 

Q.      When
he was talking to you about the way that this all occurred, what did he tell
you that he used as a weapon?

 

A.      It
wasn=t ever really brought up.  There was a mention of a crowbar, there was a
mention of a knife, but there wasn=t ever really anything specifically brought up.

 

Q.      When
did he talk about a crowbar?

 

A.      He
was actually talking to another inmate . . . because that inmate had said that C he had stated that he had heard
that [White] had used a crowbar, and Mr. 
White said, [A]Well, I don=t know anything about a crowbar.[A] 

 

Thus,
Reynolds was testifying about what another inmate Ahad heard,@ not what White
had said, and it is understandable that he had not mentioned this passing
comment by another inmate in his previous statements to his attorney or law
enforcement.








Finally, regarding any alleged inconsistency about when
White had decided to leave town, Reynolds testified on cross examination that
he told police that White said he left town when he saw his picture in the
paper but agreed that White also said he left the apartment complex where
Latasha lived when he saw police at her apartment.  We agree with the State that both
explanations are reasonable and that, consequently, no inconsistency
exists.           Even assuming that portions of Reynolds=s testimony were
inconsistent with his prior statements or with other evidence presented at
trial, the jury was free to believe some or all of the testimony.  See  Lancon, 253 S.W.3d at 706; see also
Fuentes v. State, 991 S.W.2d 267, 271B72 (Tex. Crim.
App.), cert. denied, 528 U.S. 1026 (1999) (noting that Ato avoid intruding
on the jury=s role as arbiter of the weight and
credibility of the evidence, a factual sufficiency review remains deferential
to the jury=s verdict@).  

White also asserts that Reynolds was not credible because
he was a convicted felon, he had a bad reputation for truth and honesty, and Alegal troubles
were piling up on him in a number of different counties.@  White called two witnesses to testify that
Reynolds had a reputation for being dishonest and untruthful.  It was within the purview of the jury to
determine the credibility of Reynolds=s testimony and,
as the sole judge of the witnesses=s credibility, the
jury could choose to believe some testimony and disbelieve other testimony. See
Lancon, 253 S.W.3d
at 704.
                 








We have reviewed the evidence in a neutral light, and we
find no objective basis in the record for holding that the jury=s verdict was
clearly wrong or manifestly unjust or that it was contradicted by the great
weight and preponderance of the evidence. 
See Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15, 417.  Rather, the evidence presented at trial was
sufficient to support the verdict, and no contrary evidence exists that would
render the evidence factually insufficient under the applicable standard of
review.  See Lancon, 253 S.W.3d at
704; Watson, 204 S.W.3d at 414B15, 417.
Accordingly, we hold that the evidence is factually sufficient to support White=s conviction.  

Having held that the evidence is legally and factually
sufficient, we overrule White=s sole issue.

V. Conclusion

Having overruled White=s sole issue, we
affirm the trial court=s judgment.

 

 

SUE WALKER

JUSTICE

 

PANEL: LIVINGSTON, WALKER, and
MCCOY, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: December 31, 2009











[1]See Tex.
R. App. P. 47.4.





[2]The dissassembled pocketknife
tested negative for the presence of blood. 






[3]Reynolds testified that Latasha=s cousin lived at the Humphreys
Street apartment, but in fact, Latasha=s sister lived there.





[4]Dr.
Krouse testified that six
of McDowell=s wounds were consistent with an
attack from behind.  Siobain Callahan, an
identification technician for the Wichita Falls Police Department, testified
that although she is not an expert in Acast off blood,@ it appeared that no one had been sitting in the front
passenger seat of McDowell=s van because that seat had no Asmeared blood@ patterns consistent with someone
sitting on blood.