02-11-049-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00049-CR

 

 


 
 
 Timothy Chad Smith
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 97th
District Court OF Montague COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellant
Timothy Chad Smith appeals his conviction for possessing at least four hundred
grams of methamphetamine.[2]  In two issues, he
contends that the trial court abused its discretion by allowing inadmissible
hearsay testimony and that the evidence is insufficient to support his
conviction.  We affirm.

Background
Facts

          One
evening in October 2008, Jonathan Cheshire, a Montague County Sheriff’s Office deputy,
received a dispatch indicating that there was a structure fire on Fruitland
Road, which runs through a residential neighborhood.  Deputy Cheshire arrived
at the scene and saw fire department personnel extinguishing the fire, which
had destroyed a mobile home located approximately a hundred feet away from the
road.  Appellant was sitting near the residence and wearing only shorts, socks,
and glasses; he was disturbed and had blood on his body.  He told Deputy
Cheshire that he had been alone and was not sure how the fire started but that
he had to break his bedroom window to escape the mobile home.       Deputy
Cheshire contacted Bowie Fire Department Chief Douglas Page.[3] 
Upon arriving, near the south side of the residence, Chief Page found a glass
jar containing a white powdery substance that looked like methamphetamine.[4] 
Deputy Cheshire and Chief Page asked Officer Chris Hughes to come to the
residence.[5]  Officer Hughes talked to
appellant, who did not appear to have recently used alcohol or a controlled
substance.  Appellant told Officer Hughes that he was sleeping in his bedroom
when he woke up to a house that was full of smoke and jumped out of his
window.  Without hesitation and while stating that he had nothing to hide, appellant
gave consent for Officer Hughes to search the property.

          Officer
Hughes found a cooler near appellant’s mobile home.  The cooler contained jars
and pitchers that held a liquid with a “strong chemical smell.”  Officer Hughes
collected a sample of the strong-smelling liquid.

          A
forensic scientist determined that four of the containers that the police had
found in the cooler each contained large amounts of methamphetamine.[6] 
A Montague County grand jury indicted appellant for possessing four
hundred grams of methamphetamine or more.  Appellant pled not guilty.  The jury
found him guilty and assessed forty years’ confinement as his punishment.  The
trial court sentenced appellant to the same term, and he filed notice of this
appeal.

Evidentiary
Sufficiency

          In
his second issue, appellant argues that the evidence is insufficient to support
his conviction.  In our due-process review of the sufficiency of the evidence
to support a conviction, we view all of the evidence in the light most
favorable to the prosecution to determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt.
Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).[7]

          This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact
is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075 (2009).
 Thus, when performing an evidentiary sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Williams v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007).  Instead, we determine “whether the necessary
inferences are reasonable based upon the combined and cumulative force of all
the evidence when viewed in the light most favorable to the verdict.”  Hooper
v. State, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).  We must presume
that the factfinder resolved any conflicting inferences in favor of the
prosecution and defer to that resolution.  Jackson, 443 U.S. at 326, 99
S. Ct. at 2793; Clayton, 235 S.W.3d at 778.  The standard of review is
the same for direct and circumstantial evidence cases; circumstantial evidence
is as probative as direct evidence in establishing the guilt of an actor.  Clayton,
235 S.W.3d at 778; Hooper, 214 S.W.3d at 13.

          A
person commits an offense by intentionally or knowingly possessing
methamphetamine.  See Tex. Health & Safety Code Ann. §§ 481.102(6),
.115(a); Triplett v. State, 292 S.W.3d 205, 206 (Tex. App.—Amarillo
2009, pet. ref’d).  “Possession” means actual care, custody, control, or
management.  Tex. Health & Safety Code Ann. §§ 481.002(38) (West 2010); see
Garrett v. State, 161 S.W.3d 664, 671–72 (Tex. App.—Fort Worth 2005, pet.
ref’d) (“An accused possesses a controlled substance when he exercises actual
care, control, or custody over the substance; is conscious of his connection
with the substance; and knows what the substance is.”).  As we have explained,

The evidence “must establish, to the requisite level of
confidence, that the accused’s connection with the drug was more than just
fortuitous.  This is the whole of the so-called ‘affirmative links’ rule.” 

          . . . .

          . . .  Factors we consider include . . .
whether the contraband was in plain view, . . . the defendant’s proximity to
and the accessibility of the narcotic, . . . whether the defendant was under
the influence of narcotics when arrested, . . . whether the defendant possessed
other contraband or narcotics when arrested, . . . whether the defendant made
incriminating statements when arrested, . . . whether there was an odor of the
contraband, . . . whether other contraband or drug paraphernalia were present, .
. . whether the defendant owned or had the right to possess the place where the
drugs were found, . . . whether the place where the drugs were found was
enclosed, . . . [and] whether the conduct of the accused indicated a
consciousness of guilt.

Tucker
v. State, 183 S.W.3d 501, 510 (Tex. App.—Fort Worth 2005, no
pet.) (citations omitted); see McQuarters v. State, 58 S.W.3d 250, 259
(Tex. App.—Fort Worth 2001, pet. ref’d).

          The
officers found the jars and pitchers that contained the large amount of odorous
methamphetamine inside a cooler that was in plain view and that was located ten
to twenty feet away from appellant’s mobile home.  Officer Hughes testified
that he believed that the cooler’s lid was open when he found it. Appellant
told Officer Hughes that he was the only person who had lived in the mobile
home, that he had “full control of the property,” and that only he had access
to the property.

          Along
with his seemingly exclusive possession of the property where the
methamphetamine was found, many items found on appellant’s property also link
him to the methamphetamine.  Close to the mobile home, Chief Page and Deputy
Cheshire found many empty starting fluid cans, some in a burn pile (about
fifteen feet off the west end of the mobile home) and some in barrels (on the
east end).  The cans had holes punched in them.  Deputy Cheshire testified that
methamphetamine manufacturers will “remove ether from starting fluid cans and
they’ll punch a hole at the bottom of the can to remove the ether.”  Chief Page
stated, “The chemical ether, what they do, they’ll expel the propellant out of
the can.  Take a can opener or another object and punch the can and drain the
liquid from the can.”  According to Chief Page, manufacturers then mix the liquid
with pseudoephedrine tablets.  Chief Page recognized that starter fluid may be
used by people who repair cars, but he said that he did not see any evidence of
mechanical work underway at the mobile home.  Although Officer Hughes said that
appellant’s family owns a diesel repair shop and that such a shop could use
starting fluid, he testified, 

[N]ormally, a starting fluid can won’t have a hole poked
in the bottom of it unless it’s been used to manufacture methamphetamine. 
They’ll take the can, invert it, spray all of the propellant out of the can,
and then poke a hole in the can.  Once all of the pressure is released, then
they pour the ether out of the can.

          . . . .

          . . .  The ether is a chemical solvent used in
the manufacturing process.  

          In
one of the barrels, Officer Hughes also found the remains of an HCL generator,
which, according to Officer Hughes, is 

used to produce hydrogen chloride gas.  It is some type
of vessel -- in this case, a Dr. Pepper bottle.  They’ll put salt in it and
then pour acid over the salt and that produces a hydrogen chloride gas which is
bubbled through meth oil.  And when that’s bubbled through there, it changes
the PH and the meth oil becomes methamphetamine, like the usable
methamphetamine.  And then after that, it’s filtered over and you get your
usable meth from the liquid substance.

The
HCL generator that Officer Hughes found had a “cap on it with a rubber hose
coming off of the top.”  Officer Hughes did not seize the HCL generator because
the gas it releases is toxic and can cause health problems.  The jury could
have reasonably inferred that appellant attempted to protect himself from such problems
because Deputy Cheshire found a chemical mask at the south end of the mobile
home.

          Finally,
Chief Page found a glass jar containing a white powdery residue that looked
like methamphetamine.  Although the substance was not tested, Chief Page
testified, “The glass jar[] is another apparatus that they will use
in the manufacture of methamphetamine, and it’s pretty common that once the
liquid has been removed, over a period of time, the white residue will remain
inside of the glass jars.”

          Appellant
recites some facts that could support his theory that someone else placed all
of these drug-related items on his property.  For example, Deputy Cheshire
testified that there were two residences within about two hundred feet of appellant’s
mobile home.[8]  Deputy Cheshire also
admitted that people who run clandestine methamphetamine labs often dump their
trash on the side of the road.  Finally, he conceded that it is uncommon for
someone who runs a drug laboratory to be cooperative with police officers, as
appellant was.  Chief Page testified that there was not a barrier between the
road and the mobile home that would prevent someone from dumping cans in the
burn pile or barrels.

          Chief
Page and Officer Hughes testified, however, that the starting fluid cans in the
barrels and burn pile did not appear to have been placed there recently.  Officer
Hughes believed that the starting fluid cans were burned and damaged at earlier
times.  The jury could have reasonably inferred, therefore, that appellant had
attempted to destroy the evidence of his own manufacture of methamphetamine by
burning the cans.  And even if an outsider used appellant’s property to
dump trash associated with manufacturing methamphetamine, one would not expect
the outsider to also deposit evidence of manufactured methamphetamine. 

          Appellant
also argues that his cooperation with the police officers and his consent to
their search renders the evidence insufficient that he knew the methamphetamine
was on his property.  But Texas courts have upheld convictions for possessing
controlled substances, despite defendants’ cooperation with the police, when
there were other facts that linked the defendants to the substances.  See,
e.g., Lair v. State, 265 S.W.3d 580, 584–88 (Tex. App.—Houston [1st
Dist.] 2008, pet. ref’d); Jones v. State, 963 S.W.2d 826, 830 (Tex.
App.—Texarkana 1998, pet. ref’d).

          Viewing
all of the evidence in the light most favorable to the prosecution, we conclude
that a rational jury could have found, beyond a reasonable doubt, that
appellant intentionally or knowingly exercised care, custody, control, or
management over the methamphetamine found in plain view near his mobile home.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  Thus,
we overrule his second issue.

Appellant’s
Evidentiary Objection

          In
appellant’s first issue, he asserts that the trial court abused its discretion
by allowing testimony about a statement made by Kenneth (his father), which
appellant alleges was inadmissible hearsay.  Outside of the jury’s presence, in
response to the State’s questions, the trial court heard proposed testimony
from Officer Hughes about his conversation with appellant on the evening of the
fire, and the following colloquy occurred:

          Q       Did you ask [appellant] about the other
containers [with] the liquid contents?

          A       The cooler up front, yes, I asked him
about those.

          Q       And how did he respond?

          A       I believe he told me he didn’t know
what that was and had never seen them before.

          Q       At that point, was anyone else present
to hear those remarks?

          A       The defendant’s father.

          Q       And were there remarks made by the
defendant’s father in his presence?

          A       There was.

          Q       Who is the defendant’s father?

          A       Ken or Kenneth Smith.

          Q       And what -- and did he respond
spontaneously; that is, without any question being asked of him?

          A       He did.

          Q       And what did he state?

          [DEFENSE COUNSEL]:  Your Honor, that I’m going
to object to because it will be hearsay in front of the jury.  So I’ll make a
hearsay objection to Mr. Smith’s father’s comments.

          [THE STATE]:  Okay.  If we can proceed, I think
I will be able to respond to the objection better.

          THE COURT:  All right.

          Q       . . .  If you would, state what he told
you or what he said rather.

          A       He said I know where they came from. 
Those are tea pitchers that are missing from my house.  

          Q       And you said these remarks were said in
the presence of the defendant?

          A       Yes.

          Q       When the remarks were made, did the respondent
-- excuse me, did the defendant respond in any way?

          A       Not that I remember.

          Q       Okay.  Particularly, did he make any
denial of the origin of those pitchers or any comment upon his father’s
remarks?

          A       Not at that point.  Prior to that, he
had stated that he had never seen them before.

          The
State argued that Kenneth’s statement that he knew where the tea pitchers came
from was not hearsay because it was an adoptive admission.  See Tex. R.
Evid. 801(e)(2)(B); Gant v. State, 153 S.W.3d 294, 299 (Tex.
App.—Beaumont 2004, pet. ref’d) (holding that an adoptive admission “occurs
when a statement is made in the defendant’s presence, the defendant understands
the statement, the statement calls for a reply, and the defendant remains
silent or acquiesces to the statement, although not under arrest”), cert. denied,
547 U.S. 1023 (2006).  Outside the presence of the jury, the trial court
overruled appellant’s objection to Officer Hughes’s testimony about Kenneth’s
statement.  During Kenneth’s own testimony, he denied stating on the night of
the fire that the jars had been missing from his home.  In rebuttal, the State
recalled Officer Hughes, who testified in front of the jury over appellant’s
objection, “[Appellant’s] father stated:  I know where they came from.  Those
are my tea pitchers that are missing from my house.”

          Assuming,
without deciding, that the trial court abused its discretion by admitting
Officer Hughes’s testimony about Kenneth’s statement, we must determine whether
that alleged error caused harm.  See Tex. R. App. P. 44.2.  Any error,
other than constitutional error, that does not affect substantial rights must
be disregarded.  See Tex. R. App. P. 44.2(b).  The alleged error in this
case is not of constitutional dimension.  See Solomon v. State,
49 S.W.3d 356, 365 (Tex. Crim. App. 2001); Davis v. State, 268 S.W.3d
683, 709 (Tex. App.—Fort Worth 2008, pet. ref’d) (“Because error in admitting a
statement in violation of the hearsay rules of evidence is non-constitutional,
we apply rule 44.2(b).”); Moon v. State, 44 S.W.3d 589, 594 (Tex. App.—Fort
Worth 2001, pet. ref’d) (“The admission of otherwise inadmissible hearsay is a
nonconstitutional error.”).

          A
substantial right is affected when the error had a substantial and injurious
effect or influence in determining the jury=s
verdict.  King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)
(citing Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239,
1253 (1946)).  Conversely, an error does not affect a substantial right if we
have Afair
assurance that the error did not influence the jury, or had but a slight
effect.@  Solomon,
49 S.W.3d at 365; Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App.
1998).  When conducting a rule 44.2(b) harm analysis, we review the record as a
whole, including any testimony or physical evidence admitted for the jury’s
consideration, the nature of the evidence supporting the verdict, and the
character of the alleged error and how it might be considered in connection
with other evidence in the case.  Motilla v. State, 78 S.W.3d 352, 355
(Tex. Crim. App. 2002).  We may also consider the jury instructions, the State’s
theory and any defensive theories, whether the State emphasized the error, and closing
arguments.  Id. at 355–56.

          Appellant
contends that the admission of Officer Hughes’s testimony about Kenneth’s
statement was harmful because it was the “only link of ownership or possession
offered to the jury[,] and without this testimony there would have been
insufficient evidence to convict.”  During the prosecutor’s closing argument, he
called Kenneth’s statement “significant.”  As we explained above, however, even
if Officer Hughes’s testimony about Kenneth’s statement had not been admitted, items
of physical evidence, in plain view and interspersed on various parts of
appellant’s property, connected appellant to the methamphetamine found near his
mobile home, which he said that he exclusively occupied and controlled.  Without
the aid of Kenneth’s allegedly inadmissible statement, the jury could have
rationally rejected appellant’s defensive theory that the methamphetamine was
not his based on the proximity and amount of this physical evidence.  Although
Kenneth’s statement may have provided a more specific reason for the jury to
reject appellant’s theory that someone had dumped the drug-related materials by
his mobile home, we cannot conclude that the evidence of Kenneth’s statement
likely moved the jury from acquitting appellant to convicting him.  See
Tex. R. App. P. 44.2(b); Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.
Crim. App. 2000) (stating that in determining harm, we may ask whether there is
a reasonable possibility that the error “moved the jury from a state of
nonpersuasion to one of persuasion as to the issue in question”), cert.
denied, 532 U.S. 944 (2001); see also Neal v. State, 256 S.W.3d 264,
285 (Tex. Crim. App. 2008) (“Assuming without deciding that the trial court
erred in admitting the surveillance videotapes or ATM receipts, such error was
harmless in light of the overwhelming evidence of guilt shown by other evidence
. . . .”), cert. denied, 129 S. Ct. 1037 (2009).

          Furthermore,
Kenneth conceded at trial that he had said on the night of the fire that the
jars and pitchers that the officers found in the cooler “probably [came] from
[his] property or [came] from [his] house.”  This statement is similar to
(although more equivocal than) the statement that Officer Hughes attributed to
Kenneth.  During cross-examination by appellant’s counsel, Kenneth said that his
statement on the night of the fire was a “figure of speech” and expressed that
similar containers could be bought at stores.  But when appellant’s counsel asked
Kenneth whether he had any markings on the jars and pitchers that had been
admitted into evidence and were in front of him, he said, “Well, no.  They just
mixed tea in them is all I used them for.”  No one objected to this testimony. 
Potential harm from the improper admission of hearsay evidence is lessened when
the trial court admits similar evidence without objection.  See Leday v.
State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); see also Matz v.
State, 21 S.W.3d 911, 912 (Tex. App.—Fort Worth 2000, pet. ref’d) (“It is
well-established that the improper admission of evidence does not constitute
reversible error if the same facts are proved by other properly admitted
evidence.”) (op. on remand).

          For
all of these reasons, we hold that even if the trial court erred by admitting
Officer Hughes’s testimony concerning Kenneth’s statement, that alleged error
did not affect appellant’s substantial rights.  We must therefore disregard the
alleged error.  See Tex. R. App. P. 44.2(b).  We overrule appellant’s
first issue.

Conclusion

          Having
overruled both of appellant’s issues, we affirm the trial court’s judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; MCCOY and MEIER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  September 29,
2011 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Health
& Safety Code Ann. §§ 481.102(6), .115(a), (f) (West 2010).





[3]Chief Page was called to
investigate the cause of the fire, but he could not determine a cause.





[4]This jar was left at the
scene and was not examined to validate its contents.





[5]Officer Hughes worked for
the Bowie Police Department in October 2008 but worked for a district
attorney’s office at the time of the trial.  Toward the end of his tenure with
the Bowie Police Department, Officer Hughes was a narcotics investigator.





[6]Appellant concedes on
appeal that the “[S]tate’s expert found methamphetamine when testing the
substance.”





[7]Appellant contends that
the evidence is legally and factually insufficient.  Because the court of
criminal appeals held in Brooks v. State, 323 S.W.3d 893, 895 (Tex. Crim.
App. 2010), that there is no meaningful distinction between the factual
sufficiency standard and the legal sufficiency standard, we analyze appellant’s
insufficiency arguments under only the Jackson sufficiency standard.  See
443 U.S. at 319, 99 S. Ct. at 2789.





[8]Kenneth, appellant’s
father, testified that he owned the property that appellant’s mobile home was
on.