

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

Nos. 04-11-00531-CR, 04-11-00532-CR & 04-11-0533-CR

Jason Christopher **MIEARS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2009-CR-6566, 2009-CR-6567 & 2009-CR-6568
Honorable Ron Rangel, [1] Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
            Patricia O. Alvarez, Justice
            Luz Elena D. Chapa, Justice

Delivered and Filed:  May 15, 2013

AFFIRMED

Jason Miears pleaded guilty to charges of murder and aggravated robbery, and the trial court sentenced him to fifty years in prison and to pay a fine of $2,500. Miears appeals the judgments based on matters heard and ruled on before his plea. His first two issues concern alleged errors at his competency trial: first, the trial court failed to exclude unreliable expert testimony, and second, the jury's verdict was contrary to the evidence. In his final issue, Miears

---

[1] This case was assigned to the 379th Judicial District Court of Bexar County, Texas, in which the Honorable Ron Rangel is the presiding judge. Judge Rangel ruled on Miears's motion to suppress and presided over the plea hearing. However, the competency trial was conducted by the Honorable Andrew W. Carruthers, Criminal Magistrate Judge.

complains the trial court wrongly denied his motion to suppress evidence found in his car. We affirm.

**THE COMPETENCY TRIAL**

Miears contends that the testimony of the State's expert witness was unreliable and therefore inadmissible, and that the jury's verdict was against the great weight and preponderance of the evidence.

As a defendant, Miears is presumed competent to stand trial, and he had the burden of proving otherwise by the preponderance of the evidence. TEX. CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2006). Incompetency is shown if a defendant lacks (1) the sufficient present ability to consult with the defendant's attorneys with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the defendant. *Id.* art. 46B.003(a) (West 2006).

### *The Evidence*

The defense's expert, Dr. Randall Sellers, interviewed Miears three times and assessed his competency with a clinical interview and two structured or semi-structured interviews. Dr. Sellers also spoke with Miears's mother, a psychiatrist, to determine whether some of Miears's abnormal behaviors had existed since childhood. Dr. Sellers testified Miears was very intelligent and knowledgeable about criminal law and the charges pending against him. He also testified Miears suffered from or had elements of four mental illnesses: obsessive compulsive disorder, a mood disorder, pervasive development disorder, and obsessive compulsive personality disorder.

In Dr. Sellers's opinion, Miears's illnesses would keep him from rationally coordinating his defense with his lawyer despite his intelligence. He testified that Miears, because of his intelligence, would fixate on a particular legal strategy or theory; it would then be impossible for anyone to convince him that it was incorrect or that another one was better.

Dr. Sellers also administered two tests to see if Miears was malingering—exaggerating symptoms or behaviors to achieve some secondary gain. He found signs of malingering in one test, but not in the other.

On cross-examination, Dr. Sellers clarified he thought Miears was incompetent to be tried only because Miears lacked the sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding. He explained that, although sometimes defendants make bad choices and do not properly consult with their attorneys, in his opinion the mental illnesses he saw in Miears would impair him from rationally consulting with his attorneys. He further testified Miears's lack of cooperation with the State's expert could stem from defensive rigidity arising from his mental illnesses, or that it could be an example of Miears trying to manipulate the State's expert witness, Dr. Brian Skop.

Dr. Skop did not offer an ultimate opinion about Miears's competency, but he did testify Miears was malingering and displayed elements of competency. Dr. Skop attempted five interviews with Miears; three of the interviews were unsuccessful because Miears absolutely refused to cooperate. During the first of the two interviews Miears participated in, he appeared to be psychotic, had delusions or hallucinations, and became so threatening and agitated—including using profanity and offering to perform sex acts on Dr. Skop—that Dr. Skop ended the interview after forty-five minutes. He began to suspect Miears was malingering because he knew Miears was in a mental unit meant for relatively functional inmates, and the behavior he had observed in the interview strongly conflicted with that designation. During the second interview, which lasted seventy-five minutes, Dr. Skop administered a test for malingering, the results of which were "positive off the charts." Because he suspected Miears was malingering, Dr. Skop began to investigate other evidence.

Dr. Skop reviewed the reports of Dr. Maria Ruiz-Sweeney, who was one of Miears's doctors while in jail. She initially diagnosed him as incompetent in her May 2009 report. However, after a period of time he was on medication, Dr. Ruiz-Sweeney ultimately concluded in her October 2009 report, Miears was malingering and he was competent to stand trial. Dr. Skop found her assessment matched his own independent diagnosis. Dr. Skop listened to recorded phone calls between Miears and his father, who is a criminal defense attorney. Miears asked his father to research certain cases for him and bragged he had "pulled one over" on Dr. Sweeny. Dr. Skop also reviewed the initial police interview and found evidence that showed Miears was interacting very rationally and coherently with the officer. Dr. Skop thought Miears's behavior in that interview and on the phone displayed a rational and coherent understanding of how to interact in a cooperative way. Dr. Skop also examined Miears's academic history, spoke with detention officers supervising Miears, reviewed police reports, and looked at motions Miears had filed. The motions were often filled with nonsense—"saying that his attorney is not an attorney, that everybody has AIDS"—which, when contrasted with his cooperative and functional behavior with other people, formed part of the basis for Dr. Skop's diagnosis of malingering.

The State called the custodian of records for the University of Texas at San Antonio to introduce Miears's academic transcript into evidence. The transcript shows Miears earned his Bachelor of Arts degree in political science *cum laude*, graduated with a final GPA of 3.52, and received the distinction of being variously placed on the Honor Roll, Dean's List, and President's List in several semesters. At the time of his arrest, he was a graduate student at UTSA.

The first lay witness was David Martinez, a detention officer with the Bexar County Sheriff's Office. Martinez regularly oversaw Miears for a period of five or six months, but had only seen him twice in the ten months immediately before the competency hearing. He testified

that Miears was kept in a mental unit for inmates who needed medication but were otherwise well enough to be housed together with other inmates. Miears interacted well with him, and he observed Miears interacting normally and calmly with the other inmates while he worked in the law library. He observed Miears reading USA Today, listening to the radio, and making telephone calls without difficulty or outbursts.

Keith Hottle, the Clerk of this Court, was the last witness. He testified the Clerk's office had instituted a special procedure to handle Miears's voluminous filings. Instead of assigning a case number to each filing, the filings were collected at the end of each week and assigned a joint case number. At the time of his testimony, Miears had filed 119 original proceedings that were divided among twenty-nine case numbers. Twenty-seven of the group filings had been denied, and two were pending. Hottle did not offer an opinion regarding the merits of any of the filings, but simply testified that the petitions were properly filed.

**Admissibility of Dr. Skop's Testimony**

Miears challenges the trial court's admission of Dr. Skop's testimony. He contends Dr. Skop had insufficient facts or data with which to form his opinion and the opinion was therefore unreliable. We review the trial court's evidentiary rulings for abuse of discretion. *Acevedo v. State*, 255 S.W.3d 162, 166 (Tex. App.—San Antonio 2008, pet. ref'd).

Texas Rule of Evidence 705(c) governs the reliability of underlying facts or data upon which an expert bases his opinion or testimony. *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006); *see* TEX. R. EVID. 705(c) ("If the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, the opinion is inadmissible."). The reliability inquiry is flexible, at times focusing on the reliability of scientific knowledge, at other times on the expert's personal knowledge and experience. *Vela*, 209 S.W.3d at 134.

Our decision in *Acevedo* illustrates when expert testimony should be excluded because the expert lacked a basis for his opinion. *See* 255 S.W.3d at 168-70. Acevedo was charged with murdering an acquaintance while high on methamphetamine. *Id.* at 166. At trial, the State's expert witness answered hypothetical questions about the potential effects of methamphetamine in certain scenarios; yet he also admitted that the effects vary from person to person and that he had been given none of the relevant facts about Acevedo's suspected use. *Id.* We held the witness's use of hypotheticals unrelated to the relevant facts of the case negated the probative value of his testimony, and we concluded the testimony was speculative, unreliable, and irrelevant. *Id.* at 169. It was therefore an abuse of discretion to admit his testimony. *Id.*

Dr. Skop's testimony bears no resemblance to the expert's testimony in *Acevedo*. Dr. Skop interviewed Miears twice, and although Miears was very uncooperative, his aberrant and aggressive behavior factored into Dr. Skop's diagnosis. Miears's own expert described the malingering test given by Dr. Skop as the "gold standard." In addition, Dr. Skop collected information from numerous collateral sources and explained how each additional piece of evidence fit into his assessment of Miears's malingering and possible incompetency. And he frankly admitted that he could not opine on the ultimate issue of Miears's competency; instead, he limited his opinion to diagnosing Miears as malingering and displaying some elements of competency. Because Dr. Skop adequately demonstrated the basis for his testimony and refrained from offering an opinion he could not professionally justify, we hold the trial court did not abuse its discretion in admitting his testimony.

*Factual Sufficiency*

To prevail on a factual sufficiency complaint challenging the verdict in his competency trial, Miears must demonstrate the jury's verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 154-

55 (Tex. Crim. App. 1990); *see Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (holding *Brooks v. State* did not change the traditional legal and factual standards of review for affirmative defenses proved by a preponderance of the evidence). We review all the relevant evidence in a neutral light, but defer to the jury's weight and credibility choices. *Matlock*, 392 S.W.3d at 671.

Miears's case for incompetency was based on his expert's diagnosis that Miears suffered from multiple mental illnesses. Miears offered no evidence showing those illnesses—if the jury even believed they existed—prevented him from having a rational understanding of the proceedings against him. Not only did Dr. Sellers—his own expert—testify Miears had excellent knowledge and factual understanding of the justice system, he also specified on cross-examination that he thought Miears was incompetent only on the ground that he lacked the sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding. Dr. Skop testified that Miears displayed a twisted knowledge of the justice system—e.g., a plea bargain is paying the prosecutor to drop the case—but that this skewed perspective was consistent with a malingering defendant. He supported his conclusion by reviewing how Miears acted in his initial police interview and by listening to Miears talk with his father about aspects of his case. Miears's own voluminous and correctly filed original proceedings in this court also display knowledge of the court system. The jury was clearly justified in finding Miears did not carry his burden of proof under article 46B.003(a)(2). *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003(a)(2).

Miears also claimed his illnesses produced a rigidity of thinking keeping him from consulting his attorneys with a rational degree of understanding. But the jury heard evidence that Miears changed his behavior and degree of cooperation with others based on what he needed or expected from them. With Dr. Sellers, Miears was accommodating and helpful, yet with Dr.

Skop, he was rude, lewd, and threatening. The jury had at least two reasonable interpretations of the evidence to justify finding Miears was able to rationally consult with his attorneys. The jury could have found Miears did not have any mental illness and that he was faking. *See Clark v. State*, 47 S.W.3d 211, 215-16 (Tex. App.—Beaumont 2001, no pet.). Or it could have weighed the conflicting evidence and found that any mental illness Miears may have had did not impede him from rationally consulting with his attorneys. *See Williams v. State*, 191 S.W.3d 242, 248-51 (Tex. App.—Austin 2006, no pet.). As both expert witnesses testified, rational and irrational defendants alike can make poor choices in communicating with counsel.

We hold the verdict of competency was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### THE SUPPRESSION HEARING

Following a bank robbery and after receiving a description of the male suspect and his vehicle, the police stopped Miears and conducted a warrantless search of his car. In his car, the police found evidence connecting him not only to the bank robbery, but also to a homicide investigation and an apartment robbery. After the hearing, the trial court overruled his motion to suppress. No findings of fact or conclusions of law were filed or requested. On appeal, Miears concedes he was lawfully stopped and only contests the legality of the search, contending it was not justified as a search incident to arrest, by exigent circumstances, or by the plain-view doctrine. The State replies that the search was justified under the automobile exception to the warrant requirement or under the protective-sweep doctrine.

**The Evidence**

At the suppression hearing, the only witnesses called were four police officers who responded to the bank robbery. Following his interview with two bank tellers, Matthew Porter, the initial responding police officer, broadcasted a description of the suspect who had fled with

money and was potentially armed with a gun. The broadcast placed officers on alert for a white male, about six-feet tall and in his late twenties, who was wearing dark pants, a dark jacket, and possibly a dark bandana.

Another on-scene officer, Keith Floyd, interviewed a witness, a homeowner who lives on the next street over from the bank. The witness's property adjoins the backside of the bank, and the bank is about 150 feet away. The witness observed an unknown man park outside his house and then walk around the house to get to the road where the bank is located. The witness thought the man's actions were suspicious so he took a picture of the man's car. The witness told Officer Floyd that he made eye contact with the unknown man when he returned to his car and that he looked "concerned." The witness's description of the man matched the suspect's description, which Officer Floyd received from Officer Porter. Officer Floyd examined the picture of the car the witness took and identified the car as a red Pontiac Firebird. He then broadcasted that detailed information to the other officers.

Officer Javier Arguello received the initial and follow-up broadcasts about the robbery and proceeded to the bank area to assist in looking for the suspect. Based on his instincts, he turned into a large subdivision, where he soon came across a red Pontiac Firebird. Officer Arguello began to follow the car and saw the driver was a white male. The car turned into a cul-de-sac, turned around in a driveway, and then proceeded back down the street in the opposite direction passing Officer Arguello. As they passed each other, Officer Arguello further observed the driver looked like he was in his twenties and matched the description of the suspect; the driver also looked very nervous. Officer Arguello broadcasted he was trailing a person who matched the suspect's description and vehicle, and began to follow the vehicle. He noticed the suspect was driving slowly, about twenty or twenty-five miles per hour, braking far more frequently and irregularly than would a normal driver, and making reaching and lunging

movements inside the car. Officer Arguello testified he believed those actions indicated the suspect was getting a weapon ready or hiding evidence.

As soon as a backup officer arrived to the area, Officer Arguello initiated the stop. The driver complied, and Officer Arguello quickly moved to the driver-side door to secure the driver in case he was armed and saw a black jacket lying on the passenger-side floorboard. At that point, Officer Arguello was certain the driver and the bank-robbery suspect were the same person because the driver was a white male, matching the description of the bank-robbery suspect, driving a red Pontiac Firebird in the bank's vicinity, with a dark jacket in his car, and acting very nervously around the police officers. He ordered the driver out of the car, patted him down, handcuffed him, informed him he was being detained on suspicion of robbery, and placed him in the back of his patrol car. Officer Arguello stayed close to his patrol car to watch over the suspect and did not conduct any other search of the driver or his car. Officer Arguello stayed on scene until a one-on-one identification was completed and until the driver was officially arrested.

Officer Henry, who assisted Officer Arguello in detaining the suspect and conducted a search of the car, was the last witness to take the stand. He testified only twenty or thirty minutes passed from the time he heard the initial broadcast about the robbery, until he arrived to help detain Officer Arguello's suspect. Officer Henry saw a black jacket in the Firebird and saw the driver who matched the broadcasted descriptions of the suspect—a white male in his twenties or thirties, driving a red Pontiac Firebird, wearing dark pants or jeans, and having a black jacket. Officer Henry had "a pretty good feeling" he would find stolen property in the suspect's vehicle.

Officer Henry testified Firebirds do not have traditional trunks but instead have passenger compartments extending back to the rear of the cars. He, therefore, opened the Firebird's "hatchback" to ensure the officers' safety. Inside the "hatchback" were a black bandana, a black backpack, and a computer bag, among other bags and blankets. Officer Henry could see money

in a partially opened bag. At that point, he felt he had secured the car and stopped the search until evidence technicians arrived. He was later told that a revolver had also been found in the car.

Officer Henry stayed at the scene and helped conduct a one-on-one identification of the suspect by a witness to the bank robbery. He testified the entire episode, from the first report of the bank robbery until the one-on-one identification, probably happened within an hour's time.

All four officers identified the driver of the Firebird as Miears in court.

### The Standard of Review & the Automobile Exception

When reviewing a trial court's ruling on a motion to suppress, we give the trial court's determination of historical facts almost total deference and review its application of the law de novo. *Tollefson v. State*, 352 S.W.3d 816, 819 (Tex. App.—San Antonio 2011, pet. ref'd). If findings of fact were neither requested nor issued, we imply findings that support the trial court's ruling if the evidence, viewed in the light most favorable to the ruling, supports those findings. *Id.* We may uphold the trial court's ruling on any theory of law applicable to the case. *Id.*

Police officers may conduct a warrantless search of a vehicle if they have probable cause to believe evidence of a crime may be found. *Powell v. State*, 898 S.W.2d 821, 827 (Tex. Crim. App. 1994). Exigent circumstances are not required, *Neal v. State*, 256 S.W.3d 264, 283 (Tex. Crim. App. 2008); and the automobile exception is distinct from the search-incident-to-arrest, plain-view, and protective-sweep doctrines. *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (confirming the automobile exception and protective-sweep doctrine were unaffected by the Court's narrowing of the search-incident-to-arrest doctrine); *Keehn v. State*, 279 S.W.3d 330, 335-36 (Tex. Crim. App. 2009) (upholding search of the defendant's van based on the automobile exception and rejecting plain-view rationale).

Probable cause to search requires a "fair probability" of finding inculpatory evidence at the location being searched. *Neal*, 256 S.W.3d at 282. In assessing probable cause, we necessarily evaluate probabilities, and "probabilities 'are the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Weide v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). When a search or seizure is the result of collaborative efforts between law enforcement officers, we may impute the knowledge of one officer to the other in determining whether probable cause existed. *Weide*, 214 S.W.3d at 27-28 & n.50.

### *Application*

The facts before us are similar to other Texas cases where courts found probable cause to search. In *Esco v. State*, police officers near Junction, Texas, stopped a car for a routine traffic violation and checked the license-plate number with their dispatcher. 668 S.W.2d 358, 359 (Tex. Crim. App. [Panel Op.] 1982). The dispatcher told them their detained car matched the license plate and description of a car involved in an Austin robbery committed by two white males. *Id.* The officers arrested the two white males in the car and searched the vehicle, finding disguises, weapons, and currency. *Id.* The Court of Criminal Appeals upheld the search. *Id.* at 361. Although there was no license-plate match for Miears's Firebird, we think the close physical and temporal proximity here, not present in *Esco*, make up for any deficiency caused by the lack of a license-plate match.

In a more recent Court of Criminal Appeals case, police officers were tracking down a credit card belonging to a kidnapping victim. *Neal v. State*, 256 S.W.3d at 281. They knew the card had been used in a particular area just off the highway by a thin, black man about six feet tall and a black woman in a white Ford pickup truck. *Id.* The officers spotted a man and a truck fitting the description in a parking lot at that location. *Id.* Upon seeing the officers, the suspect

appeared very nervous, walked away from the truck with its door open and motor running, and spoke with a black female. *Id.* When the officers attempted to get information from the suspect, he fled. *Id.* The Court of Criminal Appeals held there was probable cause to believe the truck would contain evidence of the kidnapping. *Id.* at 282-83.

In this case, the uncontroverted evidence reflects Officers Arguello and Henry lawfully detained Miears on reasonable suspicion he was involved with a bank robbery that happened about a mile away from the detention point and within thirty minutes of the first report of the robbery. Miears matched the description of the robbery suspect as a white male in his twenties or thirties wearing dark pants and had a dark jacket in his possession. Furthermore, he was detained while driving a red Pontiac Firebird—the same kind of car parked suspiciously near the bank during the robbery. Both officers reasonably believed that they had the bank robber and there was a fair probability that evidence of the robbery would be found in the Firebird. Based on these facts, the officers had probable cause to believe evidence of the robbery would be found in the car.[2] *See Esco*, 668 S.W.2d at 359-61; *Neal*, 256 S.W.3d at 281-83; *see also Cornejo v. State*, 917 S.W.2d 480 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (vehicle search justified when the shooting victims identified suspects' car to the police as the suspects were driving by); *Warren v. State*, No. 02-11-00052-CR, 2012 WL 858629 (Tex. App.—Fort Worth March 15, 2012, no pet.) (mem. op., not designated for publication) (vehicle search justified when detained suspect made furtive moves to hide plastic baggies the officer knew by training and experience to be drug packaging); *Smith v. State*, No. 07-98-0403-CR, 2000 WL 1597786 (Tex. App.—Amarillo Oct. 26, 2000, no pet.) (not designated for publication) (vehicle search justified where officer was on a stakeout and detained a recent robbery suspect who was wearing

---

[2] Because we find that the warrantless search was justified under the automobile exception, we do not address the State's alternative argument justifying it under the protective-sweep doctrine of *Michigan v. Long*, 463 U.S. 1032 (1983).

matching clothes, matched the physical description of the suspect, and identified himself as the person the officer was looking for). Therefore, we hold the search of Miears's car was supported by probable cause and the trial court correctly denied his motion to suppress.

## CONCLUSION

We overrule all three of Miears's issues and affirm the judgments of the trial court.

Luz Elena D. Chapa, Justice

Do Not Publish